No. 66,287

RANDALL T. CERRETTI, *et al., Appellees/Cross-appellants,* v. FLINT HILLS RURAL ELECTRIC COOPERATIVE ASSOCIATION, *Appellant/Cross-appellee.*

(837 P.2d 330)

Opinion filed July 10, 1992.

*Steve R. Fabert,* of Fisher, Patterson, Sayler & Smith, of Topeka, argued the cause, and *David P. Madden,* of the same firm, was with him on the briefs for appellant/cross-appellee.

*Jerry R. Palmer,* of Palmer & Lowry, of Topeka, argued the cause, and *Jay W. Vander Velde,* of Atherton & Vander Velde, of Emporia, was with him on the brief for appellees/cross-appellants.

The opinion of the court was delivered by

LOCKETT, J.: This is a personal injury and wrongful death action brought by Randall Cerretti individually, and as administrator of the Estate of Lynean Ann Cerretti, deceased, and by Matthew Cerretti, Josh Cerretti, and Cassie Cerretti, minors, by and through Randall Cerretti as their natural father and next friend.

Plaintiffs' sailboat's 28-foot aluminum mast contacted Flint Hills Rural Electric Cooperative Association's (Flint Hills) 7200-volt power line strung over Council Grove City Lake. Lynean Ann

Cerretti was electrocuted and Randall Cerretti injured. Plaintiffs sued Flint Hills for negligently maintaining its lines and also sued the manufacturer of the sailboat. Plaintiffs settled with the manufacturer prior to trial. The jury found Flint Hills 94% at fault, plaintiff husband and the deceased wife each 3% at fault, and the boat manufacturer 0% at fault. The judgment exceeded $1,086,000 actual damages and $75,000 punitive damages. Flint Hills appeals. Plaintiffs cross-appeal.

Flint Hills claims:

(1) The trial court imposed absolute liability;

(2) the court erred in denying Flint Hills' motion for directed verdict;

(3) the evidence was insufficient as a matter of law to support the findings of pecuniary loss;

(4) punitive damages were improperly allowed; and

(5) the trial court erred in refusing to compare plaintiff's fault for failing to comply with recall notices.

Other issues were raised but were either restatements of issues already determined, they were not separately briefed, or they contained no reference to the record. Under such circumstances, the court will not consider those issues.

Plaintiffs cross-appeal, claiming the trial court erred by:

(1) overruling plaintiffs' motion to alter or amend the judgment; and

(2) excluding plaintiffs' exhibits 4, 141, 151, and 152.

On August 22, 1987, Randall Cerretti and his family were sailing their 1979 Hobie Cat catamaran sailboat on Council Grove City Lake. The boat, which was purchased in the spring of 1979, had a 28-foot aluminum mast. Randall Cerretti sailed the boat into the Canning Creek arm of the lake where the sailboat's aluminum mast contacted Flint Hills' 7200-volt overhead power line which had been strung at a height of 26 feet and five inches over the water in 1946. Mrs. Cerretti was killed and Mr. Cerretti was injured by the electric shock transmitted through the rigging of the boat and its fittings. The three Cerretti children were not harmed. The Cerrettis were members of the defendant co-op when Mrs. Cerretti was killed.

I. Did the trial court impose absolute liability?

Flint Hills first contends the trial judge erroneously imposed (1) absolute liability on it rather than liability based on fault and (2) negligence per se for an alleged violation of the National Electrical Safety Code (NESC). To determine the issues, we will first review three relevant cases.

As a general rule, electric companies which erect and maintain lines are under a duty to exercise the highest degree of care to protect the public from danger. The degree of care required of distributors of electricity is the degree which would be used by prudent persons engaged in the industry, under like conditions and commensurate with the dangers involved and the practical operation of the plant, to guard against contingencies which can be reasonably foreseen and anticipated, but such distributors are not liable for occurrences which cannot be reasonably anticipated and are not insurers against accidents and injuries. *Henderson v. Kansas Power & Light Co.,* 184 Kan. 691, 695-96, 339 P.2d 702 (1959).

Henderson brought an action to recover damages for personal injuries sustained when electricity from defendant's high-voltage power line jumped or arced into the mast portion of a television antenna when plaintiff was assisting in turning it to obtain better reception. Plaintiff alleged the power company (1) maintained a high-tension electric wire over private property knowing or having reason to know in the exercise of due care that the electric line created a highly dangerous hazard, (2) erected and maintained the power line in a residential area without insulating the electric wire, (3) failed to post warning signs as to its extreme danger, and (4) erected and maintained the power line at a height insufficient to avoid contact with a radio or television antenna. At the close of the plaintiff's evidence the trial court granted the defendant's demurrer to the evidence, stating there was not sufficient evidence that the defendant's alleged acts were negligent and the plaintiff had failed to prove that the defendant had caused his injuries. Plaintiff appealed.

On review the *Henderson* court noted that a high-voltage power line is one of the most dangerous things known to mankind. Not only is the current deadly, but the ordinary person has no means of knowing whether any particular wire is carrying a deadly current or is harmless. Therefore, as a general rule electric companies

which erect and maintain such lines are under a duty to exercise the highest degree of care to protect the public from danger. The court stated that the test of negligence or absence of negligence is not whether the power company should have anticipated the particular act from which the injury resulted, but whether it should have foreseen the probability that injury might result from any reasonable thing that might be done upon the property by persons who had a right to go there, for either work, pleasure, or business. The *Henderson* court concluded the questions of the defendant's negligence, the proximate cause of the injuries, the foreseeability of the injuries, and the contributory negligence of the plaintiff were all questions about which reasonable minds might differ and presented questions of fact for the jury. It reversed the trial court and remanded for further proceedings. 184 Kan. at 703.

Flint Hills points out that suppliers of electricity are not insurers of the safety of the public in the vicinity of transmission lines. It notes that the standard of care for a supplier of electricity is that of prudent persons in the same business, which is less than absolute liability or strict liability imposed on sellers of defective products. It argues that suppliers of electricity are not required to make changes in pre-existing installations which have been safe for decades merely because members of the public have started to engage in negligent behavior in proximity to overhead lines. Flint Hills relies on *Wilson v. Kansas Power & Light Co.,* 232 Kan. 506, 657 P.2d 546 (1983).

Flint Hills asserts *Wilson* holds that power companies have no obligation to raise their lines merely because members of the general public have started using equipment in the vicinity which could come into contact with the power line.

Wilson brought the action against The Kansas Power and Light Co. for personal injuries he suffered when a 30-foot section of aluminum irrigation pipe he was elevating to release a gate inside of the pipe contacted the defendant's high voltage line, 23 feet, 6 inches above the ground. The plaintiff claimed that the use of metal irrigation pipes on the farm placed a duty on KPL to: (1) modify or relocate the lines in such a manner as would have prevented the accident; or (2) place warning signs on the transmission poles.

The accident occurred on an 80-acre cultivated tract of farm land. Several men were installing an irrigation system. When installed the pipe is approximately eight inches high. The *Wilson* court cited the general rules of negligence for power companies stated in *Henderson*. After discussing the fact that the accident occurred on farm land and when the irrigation system was installed and in use the pipes would be elevated only eight inches above the ground, the court determined the owners of transmission lines operating in conformity with the NESC are not under a duty to alter the lines physically solely by virtue of the owner of an adjacent cornfield shifting his operation from dry land farming to irrigated farming. Or put another way, the mere usage of metal irrigation pipe in a rural cultivated field does not, in and of itself, mandate alteration of existing electrical transmission lines otherwise satisfactorily designed and maintained. The court stated there was no evidence that a prudent power company would have physically altered the lines under the circumstances therein. Under the circumstances, to hold that usage of irrigation pipe alone creates a duty on a power company to raise, bury, relocate, or coat its lines would place an unreasonable and unrealistic burden on power companies, and in essence, elevate power companies to the status of insurers.

In *Folks v. Kansas Power & Light Co.*, 243 Kan. 57, 755 P.2d 1319 (1988), defendant KPL appealed the judgment in a wrongful death and survival action brought by the surviving spouse and minor children of the deceased. Folks, a painter employed by a third-party, was fatally injured when a metal ladder he was using came into contact with the defendant's power line. The jury, after comparing fault, awarded plaintiffs actual and punitive damages. KPL appealed, raising numerous issues, including that it was in compliance with the industry's NESC standards.

The *Folks* court noted that distributors of electricity are neither liable for occurrences which cannot be reasonably anticipated nor insurers against accidents and injuries but, because of the dangerous nature of their product, they are required to exercise the highest degree of care to avoid injury to others. Where the wires maintained by a company are designed to carry a powerful current of electricity, so that persons coming in contact with them are certain to be seriously injured or killed, the law imposes upon

the company the duty of exercising the utmost or highest degree of care to prevent such injury, especially where high-tension wires are suspended over the streets of populous cities or towns. The *Folks* court determined conformity with an industry-wide standard is not an absolute defense to negligence. While it may be evidence of due care, compliance with industry standards, or standards legislatively or administratively imposed, does not preclude a finding of negligence where a reasonable person would have taken additional precautions under the circumstances.

Flint Hills argues that when the jury instructions are read together they allowed the jury to impose liability if Flint Hills failed to bury its line to avoid a foreseeable hazard, without regard to what other prudent electric companies would have done and without regard to the applicable NESC provisions. Flint Hills bases this argument on the third paragraph of Jury Instruction No. 15 and on Jury Instruction No. 16.

It is the duty of the trial court to properly instruct the jury upon a party's theory of the case. Errors regarding jury instructions will not demand reversal unless they result in prejudice to the appealing party. Instructions in any particular action are to be considered together and read as a whole, and where they fairly instruct the jury on the law governing the case, error in an isolated instruction may be disregarded as harmless. If the instructions are substantially correct, and the jury could not reasonably be misled by them, the instructions will be approved on appeal. *Trout v. Koss Constr. Co.*, 240 Kan. 86, 88-89, 727 P.2d 450 (1986).

Instructions Nos. 15-19 must be reviewed. Instruction No. 15 reads:

"As will be more fully explained later in these instructions, negligence is the lack of ordinary care measured by all the circumstances then existing. One of the circumstances to be considered in this case is the danger and hazard presented by the operation and maintenance of electrical distribution lines. Because of this hazard, electric companies which erect and maintain high power lines are under a duty to exercise the highest degree of care to protect the public from danger.

"The test of negligence or the absence of negligence in the operation and maintenance of its electrical lines is not whether the defendant should have anticipated the particular act from which the injury resulted but whether it should have foreseen the probability that injury might result from any

reasonable thing that might be done on the property of another by people who had the right to go there for work, business or pleasure.

"The law does not compel electric companies to insulate, post warning signs, bury cables, relocate lines, or otherwise adopt safeguards for their wires everywhere, but such companies are compelled to do so at places where people may legitimately go for work, business, or pleasure; that is, where they may reasonably be expected to come into contact with power lines."

### Instruction No. 16 reads:

"In this case plaintiffs have alleged that defendant, Flint Hills Rural Electric Cooperative Association, violated the provisions of the National Electrical Safety Code pertaining to the clearance requirements over water of the Code. A copy of the pertinent provisions of the National Electrical Safety Code have been received into evidence. It is for you to decide from the evidence whether or not the National Electrical Safety Code was applicable in this case and whether or not any of the provisions of the National Electrical Safety Code have been violated."

### Instruction No. 17 reads:

"The National Electrical Safety Code contains minimum requirements and guidelines for the design, construction and maintenance of power lines. Compliance or lack of compliance with the provisions of the National Electrical Safety Code, or other applicable codes, customs or regulations, is relevant evidence on the question of negligence. However, evidence of compliance or lack of compliance with applicable safety codes is not conclusive as to the question of presence or lack of ordinary care.

"Proof of compliance with applicable codes or customs is not a defense to a charge of negligence unless such practice is consistent with standards of ordinary care. An electric company may be negligent, for example, even though it complied with the National Electrical Safety Code, if it can be shown that something more ought to have been prudently done by the company.

"On the other hand, mere proof of failure to comply with a given safety standard does not automatically demonstrate the lack of ordinary care and negligence."

### Instruction No. 18 reads:

"A distributor of electrical power has a duty to make frequent and careful inspections of its installations, to anticipate the reasonable and legitimate uses which may be made of the areas of its installations, and to eliminate

hazardous conditions existing in such areas. Failure to do so constitutes negligence."

Instruction No. 19 reads:

"A distributor of electricity is required to reasonably anticipate uses and methods of activity in the area surrounding its distribution lines, and adjust its installation accordingly to prevent injury to those persons it should have reasonably foreseen might come in contact with its lines."

Flint Hills objected to instructions Nos. 15 and 19 without stating a reason for the objection; obtained a modification of instruction No. 16 it requested; regarded instruction No. 17 as a correct statement of the law; and did not object to instruction No. 18.

No party may assign as error the giving or failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection, unless the instruction is clearly erroneous. K.S.A. 60-251(b). Jury instructions are to be considered together and read as a whole, without isolating any one instruction. If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error although they may be in some small way erroneous. *State v. Morris,* 244 Kan. 22, 23, 765 P.2d 1120 (1988).

Flint Hills argues the instructions erroneously impose an absolute obligation on it to take action to avoid injury to persons negligently engaged in recreational activities, whether or not that action is required by industry standards. It argues the test imposed by the court's instructions was one of ability to avoid injury, not a test of prudence. Further, it argues the instructions require it to rebuild its transmission lines to conform with subsequent changes. It claims the heightened standard of care imposed under the court's instructions resulted in the jury's decision to assess fault against Flint Hills and no fault against Coast Catamaran.

Flint Hills claims the district court, rather than construing the NESC as a matter of law, abdicated that responsibility to "alleged experts," and based on the experts' testimony, instructed the jury that it could impose liability upon a power company for its failure to conform its lines to subsequent changes in the NESC. Flint Hills asserts that negligence per se may not be imposed on an

electric supplier when a power line, previously conforming to NESC standards, no longer complies with an update of the NESC. The distinction between "negligence" and "negligence *per se*" is the means and method of ascertainment, in that the former must be found by the jury from the evidence, while the latter results from violation of the specific requirement of law or ordinance; and the only fact for determination of the jury is the commission or omission of the specific act inhibited or required. *Kendrick v. Atchison, T. & S. F. Rld. Co.,* 182 Kan. 249, Syl. ¶ 6, 320 P.2d 1061 (1958).

Flint Hills equates the NESC with an ordinance. It asserts that, just as an expert cannot impeach the reasonableness of a governmental unit's interpretation of its own rules, an expert cannot state his or her interpretation of the NESC. Flint Hills argues the only evidence of relevance to the interpretation of an ordinance is the manner in which the governmental body, entrusted with the enforcement of the rule or regulation, has applied it in practice.

This court has not construed the NESC as an ordinance entrusted to a governmental body to be enforced but as an industry standard approved by the American National Standards Institute. We have noted that the purpose of the NESC is the practical safeguarding of persons during the installation, operation, and maintenance of electric supply and communication lines and associated equipment. The NESC contains the basic provisions that are considered necessary for the safety of employees and the public relative to the use of electricity. The NESC is supplemented by the "National Electrical Safety Code Interpretations" which apply to situations not addressed by the NESC. The NESC guidelines set only a minimum safety standard. *Folks v. Kansas Power & Light Co.,* 243 Kan. at 62. The Introduction to the NESC, in effect at the time of the accident, states: " 'The purpose of these rules is the practical safeguarding of persons during the installation, operation, or maintenance of electric supply and communication lines and their associated equipment. They contain *minimum* provisions considered necessary for the safety of employees and the public.' (Emphasis added.)" 243 Kan. at 62.

Conformity with the NESC or an industry-wide standard is not an absolute defense to negligence. While it may be evidence of

due care, compliance with industry standards, or standards legislatively or administratively imposed, does not preclude a finding of negligence where a reasonable person engaged in the industry would have taken additional precautions under the circumstances. Whether the company is negligent, even though it complied with the code, is usually a question to be determined by the jury under proper instructions by the court.

The degree of care required for Flint Hills is that which would be used by a prudent person engaged in the industry, under like conditions and commensurate with the dangers involved and the practical operation of the system, to guard against contingencies which can reasonably be foreseen and anticipated. Flint Hills was aware that persons sailing upon the lake could be seriously injured or killed if a boat's aluminum mast contacted its high voltage power line strung over the lake. The law imposes upon Flint Hills the duty of exercising the utmost or highest degree of care to prevent such injury where people have the right to be upon the property for work, pleasure, or business. Conformity with an industry-wide standard when a high voltage line was originally installed does not preclude a finding of negligence where a prudent person engaged in the industry would have taken additional precautions under the circumstances.

When the instructions are read as a whole, the instructions conform to Kansas law. There is sufficient evidence for the jury to conclude, either under the standards of the industry or the NESC, the location of the power line should have been marked or altered so those sailing upon the lake would be warned of the danger.

II. Did the trial court err in denying Flint Hills' motion for directed verdict?

After presentation of all the evidence, Flint Hills orally moved the trial court to direct a verdict on the issue of the negligence of Coast Catamaran. It argued: (1) There was evidence that the product was manufactured and sold with a design defect which resulted in the death of Lynean Cerretti; (2) the manufacturer was aware of the design defect when it subsequently remedied that defect through a composition tip mast retrofit program; (3) a year prior to this accident, the manufacturer sold boats with a composition tip mast; (4) there is no evidence that the manufac-

turer exercised the degree of care required of a manufacturer; and (5) on appeal the Cerrettis cannot be substituted for the manufacturer to argue against its motion for directed verdict or oppose Flint Hills' claims that the manufacturer was negligent.

The trial court denied Flint Hills' motion for directed verdict stating an aluminum mast is not inherently dangerous and that, the power line was the hazardous object. It noted the manufacturer had initiated a program of notifying owners of its sailboat with an aluminum mast that power lines imposed a hazard and had initiated a mast retrofit program to counter the hazard.

Flint Hills asserts the trial court abused its discretion by not directing a verdict for it because Dr. Burdick, who prior to plaintiffs' settlement with the manufacturer had been one of their witnesses, testified at trial for the defendant that in his opinion the boat was defectively designed with a conductive aluminum mast such that when it contacted the power line it allowed high voltage to travel down the mast to occupants of the boat. He summarized it was the defective mast that caused the death of Lynean Cerretti. Flint Hills claims this evidence clearly established the legal culpability of Coast Catamaran beyond any reasonable doubt. It argues the trial judge should have determined Coast Catamaran was legally responsible for the death, instructed the jury that as a matter of law Coast Catamaran was legally at fault, and required the jury to attribute a percentage of fault to Coast Catamaran.

Flint Hills' argument is essentially that the Cerrettis' own witness established that the boat was unreasonably dangerous and defective and this defect caused the death of Lynean Cerretti. It asserts under the doctrine of judicial estoppel and the rule that a party may not impeach the testimony of the party's own witness, the Cerrettis could not impeach the witness' conclusion that Coast Catamaran was at fault. We disagree.

The jury was instructed that a manufacturer of a product has a duty to use ordinary care in the design of the product so that it will be reasonably safe for the use for which it is intended or which can reasonably be anticipated. Failure to fulfill this duty constitutes negligence. The jury was informed that a manufacturer who sells a product in a defective condition unreasonably dan-

gerous to the user is subject to liability for physical harm thereby caused to the ultimate user if:

1. the manufacturer is in the business of making such a product; and
2. it is expected that the product will reach and does reach the user without substantial change in the condition in which it is sold.

This rule applies although the manufacturer has exercised all possible care in the preparation and sale of its product and although the user has not bought the property from or entered into any contractual relation with the seller.

The trial court explained to the jury that the product is in a defective condition if, at the time it leaves the manufacturer's hands, it is in a condition which is unreasonably dangerous to the ordinary user. A condition is unreasonably dangerous if it is dangerous when used in the way it is ordinarily used considering the product's characteristics and common usage, and is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchased it, with the ordinary knowledge common to the community as to its characteristics. The defect may be in the product's preparation.

In ruling on a motion for directed verdict, the court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, and where reasonable minds could reach different conclusions based on the evidence the motion must be denied and the matter submitted to the jury. This rule is also applicable when appellate review is sought on a motion for directed verdict. *Holley v. Allen Drilling Co.*, 241 Kan. 707, 710, 740 P.2d 1077 (1987).

The only evidence on the fault of Coast Catamaran was Burdick's testimony. There was evidence that over 99% of all sailboats built in 1979 had aluminum masts. The aluminum mast had advantages over other types of masts including the composition tip mast developed to retrofit Hobie Cats. High voltage power lines strung low over sailing areas of the lake created a hazard to one using a sailboat with an aluminum mast. There is evidence that to warn users of its sailboats, the manufacturer had established a retrofit and bounty program and notified various power com-

panies that their high voltage lines were strung too low over water creating a danger to those sailing upon the water.

Here, the jury was properly instructed on the duty of a manufacturer in designing a product, although reasonable minds could reach different conclusions based on the evidence. Flint Hills has not shown that it was entitled to a directed verdict as a matter of law on the legal fault of Coast Catamaran. The trial court did not err in denying its motion for directed verdict.

III. Was the evidence sufficient to support the jury's award of pecuniary loss?

The purpose of awarding damages is to make a party whole by restoring that party to the position he or she was in prior to the injury. Damages to restore a person to a prior position are divided into economic and noneconomic damages. Economic damages include the cost of medical care, past and future, and related benefits, *i.e.*, lost wages, loss of earning capacity, and other such losses. Noneconomic losses include claims for pain and suffering, mental anguish, injury and disfigurement not affecting earning capacity, and losses which cannot be easily expressed in dollars and cents. *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 789 P.2d 541 (1990).

Specifically, Flint Hills alleges (1) the jury's award of pecuniary loss exceeded the amounts sought in the Cerrettis' pretrial order and therefore must be overturned; (2) the award for future earnings was based on speculative inadmissible hearsay and assumptions contrary to the evidence; and (3) there was no evidence of any pecuniary loss to the children. We note that the verdict form does not itemize the jury finding as to the specific economic and noneconomic losses suffered by Randall Cerretti or the children for loss of Lynean Cerretti.

In a negligence action, recovery may be had only where there is evidence showing with reasonable certainty the damage was sustained as a result of the complained-of negligence. Recovery may not be had where the alleged damages are too conjectural or speculative to form a basis for measurement. To warrant recovery of damages, therefore, there must be some reasonable basis for computation which will enable the trier of fact to arrive

at an estimate of the amount of loss. *Morris v. Francisco,* 238 Kan. 71, Syl. ¶ 3, 708 P.2d 498 (1985).

Flint Hills first argues that a judgment in excess of the amount prayed for is an illegal judgment in Kansas. It asserts plaintiffs' failure to amend their prayer to conform to the judgment requires the judgment be set aside. It cites *Ettus v. Orkin Exterminating Co.,* 233 Kan. 555, 665 P.2d 730 (1983), and *Garden City Country Club v. Commercial Turf Irrig., Inc.,* 230 Kan. 272, 634 P.2d 1067 (1981). The Cerrettis respond that the judgment is within the aggregate prayer of plaintiffs. In addition, they point out the cases cited by Flint Hills relate to prayers in terms of aggregate prayers for damages rather than a specific element of damages and are not controlling. We agree with the Cerrettis' assessment of the cases cited.

The jury awarded pecuniary damages of $200,000 for Randall Cerretti and $850,000 for the three Cerretti children, a total of $1,050,000, as a result of the death of Lynean Cerretti. The plaintiffs' pretrial order claims damages, pecuniary and nonpecuniary, of $1,222,075.05 plus an award of punitive damages. Flint Hills points out the total pecuniary loss requested for the death of Lynean Cerretti by plaintiffs was $1,015,907.68; therefore, the judgment is approximately $34,100 more than plaintiffs claimed.

The jury's award of $200,000 and $850,000 as pecuniary damages was reduced by the 6 percent fault of the Cerrettis by the trial judge, resulting in a total judgment of $987,000 for pecuniary loss ($188,000 + $799,000 = $987,000). The final judgment is less than the pecuniary damages awarded by the jury, less than the pecuniary loss claimed by plaintiffs in their pretrial order, and less than the total loss claimed for the wrongful death. After reduction of the fault attributed to the plaintiffs, the judgment for pecuniary losses does not exceed the amount requested in the pretrial order.

As to its second contention, Flint Hills argues that the pecuniary awards are based on speculative assumptions. Flint Hills argues that *McCart v. Muir,* 230 Kan. 618, 641 P.2d 384 (1982), prohibits the award of pecuniary damages based on speculative or presumptive economic losses.

When a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, it is not the function of this

court to weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the prevailing party, supports the verdict, it will not be disturbed on appeal. *Wisker v. Hart,* 244 Kan. 36, 37, 766 P.2d 168 (1988).

The burden of proving the damages incurred rests on the plaintiff. It is the function of the trier of fact to determine the amount of damages that should be awarded to a party, based upon evidence of the loss suffered. A reasonable basis for computation and the best evidence obtainable under the circumstances should enable the trier of fact to make an estimate which provides an adequate recovery of damages. *Short v. Wise,* 239 Kan. 171, 177-78, 718 P.2d 604 (1986). Flint Hills argues that the allowance of pecuniary awards cannot be based on speculative or presumptive economic losses. *McCart v. Muir,* 230 Kan. 618.

Flint Hills states the only proper evidence of pecuniary loss to Randall Cerretti due to the death of his wife is the $11,686.98 expended to hire a substitute bookkeeper, housekeeping services, and a babysitter. It claims that all other claimed economic losses were based on the testimony of plaintiff's expert economist, Dr. Gary Baker, and $200,000 of other nebulous, unspecified economic losses. Flint Hills contends that Baker's report relied exclusively upon hypothetical, speculative, hearsay assumptions as to possible future economic benefits. It argues that Baker, when determining the economic loss, assumed as an established fact that Lynean Cerretti would obtain a teaching position and earn a figure extracted by guesswork from the pay schedules for the three school districts nearest the Cerretti home.

Baker is a professor of finance at Washburn University. His projected economic losses were the subject of exhibits offered by both the Cerrettis and Flint Hills. Flint Hills experts estimated the historic loss plus the present value of the future loss resulting from the death of Lynean to be between $689,689 and $728,123. The Cerrettis' experts estimated the historic loss plus the present value of the future loss to range between $796,254 and $804,221. The historic loss represented the value of household services plus one year of employment as a teacher from August 22, 1987, the date of the accident, until October 29, 1990. The calculation of the value of household service included such services as dietitian,

chauffeur, buyer, cook, dishwasher, housecleaner, laundress, nurse, etc. This estimate was exclusive of any value which could be attributed to a mother's activities in the area of moral training, social training, educational assistance, and a mother's role as nurturer and counselor. The present value of the future loss included the value of household services plus the income which would have been earned as a teacher. The amounts of the historic loss and the present value of future loss is broken down between wages and household services.

The jury was not obligated to give credence to Baker's testimony. Even where such expert testimony on extent of future loss is admitted, the trier of fact will not be bound by the expert's testimony and may accord the testimony as little or as much weight as it deems appropriate. *Wentling v. Medical Anesthesia Services,* 237 Kan. 503, 510, 701 P.2d 939 (1985).

Although Lynean Cerretti had obtained a teaching degree, she had not taught. Flint Hills points out the sole evidence on whether in the future Lynean would seek employment was the testimony of Randall Cerretti, who testified he had a discussion with his wife where she stated she was "ready to possibly re-enter the work force and try to find a teaching job." We recognize that when the only testimony is the uncontradicted and unimpeached testimony of the husband of a conversation with his now deceased wife, evidence to contradict his testimony is usually unavailable. In such case, it is for the jury to test the credibility of the witness. See *Tice v. Ebeling,* 238 Kan. 704, Syl. ¶ 2, 715 P.2d 397 (1986).

We agree with Flint Hills' statement that recovery may not be had where the alleged damages are too conjectural or speculative to form a basis for measurement. To warrant recovery of damages there must be some reasonable basis for computation which would enable the trier of fact to arrive at an estimate of the amount of loss.

In *Morris v. Francisco,* 238 Kan. 71, the plaintiff, a victim of cerebral palsy since her birth, brought a medical malpractice action against the defendant physician. The physician determined the plaintiff needed additional surgery on her hips and ankles to enhance and preserve her ability to walk. After the surgery had been performed, the plaintiff's condition was worse and she was

confined to an electric wheelchair. The jury found the doctor negligent and awarded the plaintiff damages. On appeal, one of the defendant's contentions was that the jury had been allowed to improperly award future loss of time or income based on plaintiff's desire to become a kindergarten teacher or a teacher of handicapped children prior to her surgery. The doctor claimed that the plaintiff was not entitled to an award based on the income lost. as a teacher.

The *Morris* court noted damages for impairment of earning capacity cannot be recovered in a personal injury action where there is no evidence of the impairment or evidence from which damages can be calculated. Although the evidence need not show conclusively or with absolute certainty that earning capacity has been impaired, mere conjecture or speculation does not warrant an award of damages therefor in personal injury actions. The court recognized that all damages, however, are subject to some uncertainties and contingencies, especially those that seek to compensate for future injuries. Accordingly, most courts hold that in order to warrant a recovery for impairment of earning capacity in personal injury actions, the impairment of earning capacity must be shown with reasonable certainty or reasonable probability, and there must be evidence which will permit the jury to arrive at a pecuniary value of the loss. 238 Kan. at 78. The *Morris* court determined that the jury had failed to compare what the injured party was capable of earning at or before the time of her injury with what the party was capable of earning after her injury.

The factors which convinced the *Morris* court that the plaintiff's pre-surgery condition and qualifications did not warrant an award for future loss of earnings as a teacher are not present in this action. Here, Lynean Cerretti was in good health when she died. The jury found that Lynean Cerretti's desire to become a teacher was real, part of a family plan, and a realistic expectation because she had completed the educational requirement to be a teacher and had no pre-accident disabilities which would have affected her employability as a teacher. In addition, there was evidence of the anticipated income of a teacher in the Emporia, Kansas, area. After reviewing the record we find that there is evidence upon which to base the award, and the testimony of plaintiff's expert witness, Dr. Baker, provided a reasonable basis

for computation that enabled the trier of fact to arrive at the approximate amount of future losses.

As to its third contention, that there was no evidence of pecuniary loss to the children, Flint Hills' only argument is that all of the proven economic losses were suffered by Randall Cerretti and, therefore, the award to the Cerretti children for pecuniary loss must be set aside.

As noted, when a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, it is not the function of this court to weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the prevailing party, supports the verdict, it will not be disturbed on appeal. *Wisker v. Hart*, 244 Kan. at 37.

Flint Hills' objections to the damages instruction at trial appear to have involved only the separation of pecuniary and nonpecuniary damages and the separation as to recipients. The instruction indicated that, as to Randall Cerretti, pecuniary damages included loss of services, attention, marital care, advice and protection, and loss of earnings Lynean would have provided. The instruction indicated that, as to the Cerretti children, pecuniary damages included loss of services, attention, parental care, advice and protection, loss of their mother's nurturing, loss of the educational assistance of their mother, loss of the counsel and advice of their mother, loss of the moral training and guidance of their mother, loss of the value of a complete family, and loss of financial support which Lynean would have provided during the children's minority. The instruction also directed the jury to allow an amount for these items that the jury believed to be equivalent to the monetary benefits or compensation plaintiffs could reasonably have expected to receive from the continued life of the deceased.

There is no doubt that Cerretti and his children actually suffered losses, and there can be no serious contention that the care, guidance, and services of a spouse and parent lack monetary value. The reports and the testimony of Dr. Baker and the testimony of Randall Cerretti support the verdict. Under the applicable standard of appellate review, the verdict as to pecuniary damages will not be disturbed.

IV. As a matter of law, punitive damages were not allowable.

In Kansas, punitive damages are awarded to punish the wrong-doer for malicious, vindictive, or willful and wanton invasion of another's rights, with the ultimate purpose being to restrain and deter others from the commission of similar wrongs. *Folks v. Kansas Power & Light Co.*, 243 Kan. 57, Syl. ¶ 6, 755 P.2d 1319 (1988).

An award of punitive damages must be reviewed in the light of the actual damages sustained, the actual damage award, the circumstances of the case (the nature, extent, and enormity of the wrong), the intent of the party committing the wrong, the relative positions of the plaintiff and the defendant, the defendant's financial worth, and the plaintiff's probable litigation expenses. When reviewing punitive damages, any mitigating circumstances which may bear upon any of the above factors may be considered to reduce such damages. *Folks*, 243 Kan. 57, Syl. ¶ 8.

Flint Hills argues there was no clear and convincing evidence of wantonness or of a wanton act as required by K.S.A. 1991 Supp. 60-3701. It contends that under that statute, a wanton omission, *i.e.*, the failure to act, cannot be the basis for a punitive damage award. Flint Hills requested the trial judge to direct a verdict on the punitive damages claim. In denying the motion for directed verdict, the court observed that there must be clear and convincing evidence of wanton conduct to support punitive damages. It noted Flint Hills CEO Gerald Ridenour was informed in 1982 that there was a Flint Hills 7200-volt line over the west end of the Council Grove City Lake that could interfere with sailboats. The power line was dangerous. After receiving notice, there was no action by Ridenour or anyone under him who inquired as to the lines or the use of the lake by sailboats. When warned of the hazard, Ridenour failed to determine the height of the line over the lake. The defendant did not refer to the NESC to determine the required clearance under the existing conditions. The trial judge observed that the purpose of punitive damages is to punish and to restrain and deter others. The judge found the evidence sufficient to allow the issue of punitive damages to go to the jury.

K.S.A. 1991 Supp. 60-3701(c) provides:

"In any civil action where claims for exemplary or punitive damages are included, the plaintiff shall have the burden of proving, by clear and convincing evidence in the initial phase of the trial, that the defendant acted toward the plaintiff with willful conduct, wanton conduct, fraud or malice." (Emphasis added.)

The trial court instructed the jury that punitive damages may be allowed in the jury's discretion to punish a defendant and to deter others from acting in a wanton manner. An act performed with a realization of the imminence of danger and a reckless disregard or complete indifference to the probable consequences of the act is a wanton act.

The burden was on plaintiffs to prove by clear and convincing evidence the defendant acted as claimed. Clear and convincing evidence means evidence that is certain, unambiguous, and plain to the understanding and so reasonable and persuasive as to cause the jury to believe it.

If the jury found the defendant did one or more of the acts claimed by the plaintiffs, the jury was then to determine whether there was clear and convincing evidence that the defendant acted in a wanton manner.

The instructions do not indicate an omission may be a wanton act.

The jury found Flint Hills' conduct to be wanton and that punitive damages should be assessed against Flint Hills. At a post-trial hearing punitive damages were fixed by the court at $75,000.

On appeal, Flint Hills points out that when the line was originally installed there was no hazard. It asserts because the original installation of the line was neither negligent nor in violation of any standard, it neither created nor caused any substantial risk; only subsequent events created by Coast Catamaran and its customers created any risk of injury. Flint Hills asserts that for its conduct to be wanton, an imminent risk of injury or death must be present at the time it installed the line. It also claims for punitive damages to be assessed against a corporate defendant, the wanton conduct must be performed, expressly authorized, or ratified by a managerial employee of the corporation. Flint Hills argues the only conduct suggested to meet this test is the failure

of Gerald Ridenour to order relocation of the line after receiving a letter from Coast Catamaran.

As noted, Flint Hills claims that, under K.S.A. 1991 Supp. 60-3701, passive acts of omission cannot form the basis for an award of punitive damages. It asserts the statute requires a willful or wanton act of misconduct, not a willful or wanton omission or wrongful nonfeasance. Flint Hills argues the legislature's choice of language was not inadvertent and was motivated in part by this court's decision in *Gould v. Taco Bell*, 239 Kan. 564, 571, 722 P.2d 511 (1986). The *Gould* case was filed on July 18, 1986. K.S.A. 1991 Supp. 60-3701 was passed during the 1987 session of the legislature and became law July 1, 1987. Flint Hills claims that when enacting the statute the legislature reinstated the historical pattern of allowing punitive damages when a tortfeasor acts with extraordinary culpability. We disagree with Flint Hills' assertion that the legislature, by enacting 60-3701, intended to overturn our decision in *Gould.*

In *Gould*, this court allowed punitive damages to be awarded against a defendant whose sole alleged wrongful conduct was an act of omission. Gould alleged Taco Bell, a restaurant, failed to provide security measures sufficient to protect her, a business invitee, from injuries inflicted by another invitee. Gould was twice assaulted inside the restaurant and again in the parking lot when she tried to flee. Gould alleged that Taco Bell's employees should have prevented the conduct of the assailant, thereby saving her from injuries inflicted by the other patron. 239 Kan. at 566-67.

We determined that a proprietor of an inn, tavern, restaurant, or like business is liable for an assault upon a guest or patron by another guest or third party where the proprietor has reason to anticipate such an assault and fails to exercise reasonable care to forestall or prevent the same. 239 Kan. at 567.

The *Gould* court observed that a "wanton act" is defined as something more than ordinary negligence but less than a willful act. It must indicate a realization of the imminence of danger and a reckless disregard and indifference to the consequences. Wantonness is said to be the mental attitude of the wrongdoer rather than a particular act of negligence. It concluded that acts of omission as well as acts of commission can be wanton since

reckless disregard and indifference are characterized by failure to act when action is called for to prevent injury. 239 Kan. at 572.

In *Cope v. Kansas Power & Light Co.,* 192 Kan. 755, 391 P.2d 107 (1964), plaintiff sought damages for personal injuries sustained when he was severely and permanently injured after coming into contact with defendant's 7200-volt uninsulated transmission line. There, the power line was not a hazard until construction commenced in the area. Discussing wanton conduct, the court noted that to constitute wantonness, the acts complained of must show not simply lack of due care, but that the power company must be deemed to have realized the imminence of injury to others from its acts and to have refrained from taking steps to prevent injury because it was indifferent to whether it occurred or not. If a power company has reason to believe its act may injure another, and so acts with indifference to whether it does or not, the power company is guilty of wanton conduct. 192 Kan. at 761.

Here, the jury found there was clear and convincing evidence that Flint Hills' officer was authorized to act. It determined that Flint Hills' officer had wantonly failed to act when action was required, and the corporation should be punished so others would be deterred by the award of punitive damages. We find there is sufficient evidence to support the jury's verdict.

Finally, Flint Hills argues that the award for punitive damages was for its failure to relocate the line, conduct for which Flint Hills is not legally liable. Flint Hills states punitive damages are awarded for wanton conduct which caused the injury and not for wanton conduct which caused no injury. Flint Hills argues one cannot determine whether the jury found that it was the defendant's wanton conduct, *i.e.,* failure to move, raise, or mark the high voltage line, which caused the injury or whether it was the plaintiffs' wanton conduct, using a sailboat with an aluminum mast, that caused the injury.

When a verdict is challenged for insufficiency of evidence, it is not the function of this court to weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the prevailing party, supports the verdict, it will not be disturbed on appeal. *Wisker v. Hart,* 244 Kan. 36, 37, 766 P.2d 168 (1988).

, We disagree with the defendant's analysis. It is clear the jury found it was Flint Hills' wanton conduct that caused the plaintiffs' injuries. The trial judge instructed the jury that the Cerrettis claimed that Flint Hills acted in a wanton manner when it negligently failed to maintain its power lines. It was the plaintiffs' assertion that this failure created an unreasonable risk of serious injury or death and, under such circumstances, Flint Hills' failure was a wanton act for which the defendant should be punished and others deterred. The judge informed the jury that an act performed with a realization of the imminence of danger and a reckless disregard or complete indifference to the probable consequence of the act is a wanton act.

The jury was properly instructed on the law pertaining to punitive damages. Without weighing evidence and in drawing all reasonable inferences after considering the evidence in a light most favorable to the prevailing party, we find there is clear and convincing evidence to support the award of punitive damages.

   V. The trial court erroneously refused to submit the Cerrettis' failure to comply with recall notices as a ground for comparative fault.

Flint Hills claimed a Hobie Cat with an aluminum mast is an inherently dangerous means of conveyance when sailed near the shoreline of lakes. Prior to trial, Cerretti obtained an order from the trial court prohibiting Flint Hills from making any reference to a composition tip, or "comp-tip," mast retrofit program instituted by the manufacturer of the sailboat. Flint Hills asserts the jury should have been allowed to consider the Cerrettis' failure to replace the aluminum mast with a nonconductive substitute offered by the manufacturer when determining plaintiffs' percentage of fault. It claims Kansas cases clearly state that the failure of a product user to follow instructions necessary for safe use is contributory negligence and actionable common-law fault where a third party has been injured.

The Cerrettis point out that after they settled with Coast Catamaran, the case proceeded to trial without the manufacturer as a defendant even though Flint Hills could have joined the manufacturer as a defendant under the joinder provision of K.S.A. 1991 Supp. 60-258a(c). The jury was instructed to compare the negligence of Coast Catamaran to the other parties. The Cerrettis

conclude if the manufacturer was a party in the action, the manufacturer could have raised the defenses to a plaintiff's products liability claim, but there is no case law that allows Flint Hills to assume Coast Catamaran defenses. The Cerrettis state if plaintiffs had brought a products liability action against Flint Hills, the failure to retrofit with the comp-tip mast would be an issue, but since this is a negligence action, failure to retrofit is not an issue.

Under K.S.A. 1991 Supp. 60-258a, all of the fault attributable to all of the parties is to be compared. The statute was enacted to impose individual liability for damages based on the proportionate fault of all the parties to the occurrence which gave rise to the injuries and damages in a single action whenever possible. The plaintiffs' fault is to be compared to all of the defendants' fault, whether or not the defendants have any relationship to one or another. The percentage of causal negligence against each person involved in a negligence action is based on the rights and liabilities of each person. Although Flint Hills cannot assume Coast Catamaran's defense, the fact that the Cerrettis settled with Coast Catamaran does not prevent Flint Hills from having the Cerrettis' and Coast Catamaran's negligence considered by the trier of fact.

As to Flint Hills' claim that a sailboat with an aluminum mast is inherently dangerous, the Cerrettis argue there is no evidence that aluminum masts are inherently dangerous or need to be replaced. They assert a great majority of sailboats in use today have aluminum masts. A person using a sailboat with an aluminum mast does not assume the risk of being electrocuted. The Cerrettis claim that even if the comp-tip mast provides additional protection from an inadvertent collision with a suspended wire, the Cerrettis owed no legal duty to Flint Hills; therefore, evidence of the Cerrettis' failure to replace the aluminum with a comp-tip mast cannot be used to compare negligence.

The Cerrettis claim the most appropriate analogy to Flint Hills' claim that the plaintiffs failed to replace the aluminum mast is the failure to use a seat belt or properly use a child safety seat in an automobile. They argue that in a negligence action these devices, if properly used, could avoid or reduce injury in an automobile collision caused by another's fault. For authority they

cite *Rollins v. Kansas Dept. of Transportation,* 238 Kan. 453, 711 P.2d 1330 (1985).

In *Rollins,* the plaintiff, a passenger in an automobile that was involved in a one-car accident on a portion of Kansas Highway 25 that was undergoing resurfacing sued the Department of Transportation (KDOT). 238 Kan. at 454. At trial, KDOT called an expert witness who testified the driver of the automobile had lost control of the vehicle because she was not using her seat belt. The plaintiff's objection to this testimony was overruled. The jury found no fault on the part of KDOT. On appeal, we noted that one is not required to anticipate negligence and guard against damages which might ensue if such negligence should occur. We determined that evidence of the nonuse of seat belts by a driver of, or a passenger in, an automobile is inadmissible in a negligence action.

The Cerrettis state Flint Hills is contending it is entitled to raise defenses of other parties, even if they are not parties to the action. The Cerrettis assert that the defenses in product liability actions are only available to the manufacturer and not to a negligent third party. The Cerrettis agree under the circumstances the correct procedure is for the negligence of Flint Hills, Coast Catamaran, and the Cerrettis to be compared.

Flint Hills states the manufacturer's recall notice is analogous to a warning that a car's brakes are subject to failure rather than a failure to use seatbelts. Ignoring a notice to repair one's brakes is negligence. Flint Hills claims that failure to heed a manufacturer's notice of a defect in its product and failure to take advantage of an offer of free repair or replacing the defective part is not only ordinary negligence but an assumption of risk. It claims all legal fault causally related to the damages is relevant whether there is a specific duty owed directly to the named defendant or not.

Under the instructions, the jury was informed that the Cerrettis had been warned of the hazard of an aluminum mast contacting an overhead electrical line. The jury determined the Cerrettis were not operating a dangerous instrument.

We note that even if Flint Hills had been allowed to assert the Cerrettis' failure to retrofit the sailboat with a comp-tip mast was negligent, the results of this case would be unchanged be-

cause the Coast Catamaran dealer testified that the comp-tip replacement mast offered to Hobie Cat owners had to be installed by the dealer. The first comp-tip mast available for the Cerrettis' sailboat did not arrive at his dealership until one week after the Cerretti accident. Even if the Cerrettis had wanted to replace the aluminum mast they could not have obtained a comp-tip mast prior to the accident.

In light of the dealer's testimony, any error of the court in refusing to allow evidence of the Cerrettis' failure to replace the aluminum mast was harmless error, if in fact it was error. Harmless error is error which does not prejudice the substantial rights of a party. It affords no basis for a reversal of a judgment and must be disregarded. *Hagedorn v. Stormont-Vail Regional Med. Center,* 238 Kan. 691, 701, 715 P.2d 2 (1986).

Our decision in this case disposes of plaintiffs' first issue on cross-appeal and makes it unnecessary for us to consider the second cross-appeal issue.

Affirmed.