(994 P.2d 1072)

No. 78,987

RICHARD HUFFMAN and KAREN HUFFMAN, *Appellees*, v. THOMAS V. THOMAS, M.D., *Appellant*.

Opinion filed July 9, 1999.

*Reid F. Holbrook* and *Sally A. Howard,* of Holbrook, Heaven & Fay, P.A., of Kansas City, for appellant.

*Michael L. Sexton,* of Sexton, Shelor, Latimer & Pryor, of Shawnee Mission, and *James E. Shetlar,* of Law Offices of James E. Shetlar, of Overland Park, for appellees.

Before ELLIOTT, P.J., MARQUARDT, J., and ROGG, S.J.

MARQUARDT, J.: Dr. Thomas V. Thomas appeals a jury award in favor of Richard and Karen Huffman awarding them pecuniary and nonpecuniary damages for the wrongful death of their son, Robert.

On July 21, 1993, while working at Edgar's Transmission Service, Robert Huffman drove a full-sized pick-up truck onto a lift. The truck fell off the lift, pinning Robert to the floor.

Paramedics transported Robert to the Providence Medical Center emergency room (ER) where he was seen by Dr. Payne at 12:50 p.m. Dr. Payne noted that Robert's vital signs were normal; however, he ordered a series of blood tests, x-rays, and a CT scan. No x-ray of Robert's chest was ordered.

Dr. Payne contacted a neurosurgeon, an orthopedist, and a urologist. The Huffmans requested that Dr. Lee, a general surgeon, be contacted; however, he was not available. At 1:30 p.m., Dr. Payne called Dr. Thomas, a cardiothoracic surgeon. The time at which Dr. Thomas arrived at the ER is in dispute. Dr. Payne testified that it was approximately 2 p.m. and Dr. Thomas testified that it was 3 p.m.

When Dr. Thomas arrived in the ER, he reviewed the CT scan results which showed that "[t]here was blood up and down along the aorta. There was also some free blood in the chest space that is between the lung and the wall of the chest." The CT scan also

showed a severance of the left renal artery, a badly broken pelvis, several spinal fractures, and a large amount of blood in Robert's lower abdomen.

At 3:40 p.m., Dr. Thomas ordered a chest x-ray which showed the presence of fluid in Robert's chest. Dr. Thomas inserted a tube in Robert's chest and extracted approximately 1,100 cc of blood. Dr. Thomas determined that Robert had a "slow bleed" in his chest.

At 4 p.m., Robert was taken to the cardiac catherization lab for an aortogram. Before the procedure began, Robert's heart stopped. Robert was revived and the procedure was completed. The aortogram showed two tears in the thoracic aorta and surgery was indicated.

Dr. Thomas was informed that it would be 30 to 45 minutes before the operating room and staff could be ready to do the surgery. Thus, Robert was transferred to the intensive care unit, the "safest place for him before going to the operating room." Robert died in the intensive care unit at approximately 6:30 p.m.

Richard and Karen Huffman individually, and Richard as administrator of Robert's estate, filed a wrongful death and survival action against Providence Medical Center, Inc., Dr. Payne, Emergency Physician Services of Kansas City, Inc., Emergency Medical Services, Inc., Medical Group, P.A., and Dr. Thomas. The Huffmans estimated they suffered pecuniary and nonpecuniary damages in the amount of $1,125,682.90.

While the action was pending, Medical Group, P.A., Dr. Payne, Emergency Medical Services, Inc., d/b/a Emergency Physician Services, Inc., and Providence Medical Center were dismissed. Dr. Thomas is the only remaining defendant.

The Huffmans filed a motion in limine asking the trial court to exclude evidence of Robert's comparative negligence. Dr. Thomas filed a motion in limine asking that certain testimony from the Huffman's economic expert be excluded.

At the hearing on both parties' motions in limine, the parties agreed to most of the issues raised. The dispute at the hearing centered on whether Dr. Thomas would be allowed to introduce evidence of Robert's comparative negligence. Dr. Thomas offered

testimony from the owner of the transmission shop, Charlie Edgar, who believed that Robert incorrectly placed the truck on the lift. The trial judge ruled that evidence of Robert's comparative negligence would not be admitted.

A trial was held, and at the end of the Huffmans' case, Dr. Thomas moved for a directed verdict, arguing that the Huffmans failed to present expert testimony that would establish a causal connection between Dr. Thomas' actions and Robert's death and that the Huffmans did not present sufficient economic testimony to allow the jury to award pecuniary damages. The trial court denied the motion, stating that the Huffmans presented enough evidence to allow the case to go to the jury. The judge did not immediately rule on the issue of pecuniary damages.

At the close of his case, Dr. Thomas again moved for a directed verdict. The trial judge denied the motion, including the portion involving pecuniary damages.

The jury returned a verdict finding Dr. Payne 35 percent at fault, Providence Medical Center 5 percent at fault, and Dr. Thomas 60 percent at fault. The jury also found that Robert's chance for survival had he received proper medical care was 80 percent. The jury awarded nonpecuniary damages of $150,000 and pecuniary damages of $907,732.52. A judgment of $634,639.51 was entered against Dr. Thomas.

Dr. Thomas filed a motion for a new trial, renewing the issues raised in his motions for a directed verdict and also the issue of jury misconduct. Dr. Thomas presented an affidavit from one juror which stated that the jury considered attorney fees when setting the amount of pecuniary damages. Dr. Thomas also provided the trial court with a sworn statement from one of the defense attorneys, Sally Howard, who swore that another juror told her about alleged jury misconduct. Dr. Thomas asked the court to recall the jurors and question them about any misconduct.

The Huffmans presented affidavits from nine jurors which stated that attorney fees were not considered when computing pecuniary damages. The trial judge refused to recall the jurors and denied Dr. Thomas' motion for a new trial. Dr. Thomas appeals all adverse rulings of the district court.

### Comparative Negligence

Dr. Thomas argues that the jury should have been allowed to consider Robert's negligence. He states that comparative fault should be considered even in a medical malpractice action. The trial court's order denying a new trial listed five reasons for excluding evidence of comparative negligence. The trial judge also stated that there was no causal relationship between the cause of Robert's injuries and the treatment given by Dr. Thomas.

An appellate court's review of conclusions of law is unlimited. *Gillespie v. Seymour*, 250 Kan. 123, 129, 823 P.2d 782 (1991).

K.S.A. 60-258a(a) states:

> "The contributory negligence of any party in a civil action shall not bar such party or such party's legal representative from recovering damages for negligence resulting in death, personal injury, property damage or economic loss, if such party's negligence was less than the causal negligence of the party or parties against whom claim for recovery is made, but the award of damages to any party in such action shall be diminished in proportion to the amount of negligence attributed to such party. If any such party is claiming damages for a decedent's wrongful death, the negligence of the decedent, if any, shall be imputed to such party."

The Kansas Supreme Court applied this statute to the medical malpractice case of Cecil Wisker, who was injured in a motorcycle accident. The emergency room treating physician instructed Wisker to refrain from all strenuous activity and lifting. *Wisker v. Hart*, 244 Kan. 36, 37, 766 P.2d 168 (1988). Disregarding the instructions, Wisker returned to his job as a mechanic and aggravated his injury. He died after unsuccessful surgery. The jury in the wrongful death proceedings was permitted to consider Wisker's fault. 244 Kan. at 40-41. See also *Cox v. Lesko*, 263 Kan. 805, 953 P.2d 1033 (1998) (jury allowed to consider comparative fault when the plaintiff did not perform rehabilitation exercises that were prescribed by her physician).

These decisions are distinguishable from the instant case because both Wisker and Cox failed to follow their physician's instructions. Robert Huffman had no opportunity to follow or disregard Dr. Thomas' instructions.

In Florida, Jimmy Whitehead went to an emergency room after attempting suicide by taking an overdose of various pills. He

stopped breathing and was not immediately revived. This ultimately led to his death. The plaintiff's expert witness testified that the treatment Whitehead received fell below the standard of care. *Whitehead v. Linkous*, 404 So. 2d 377 (Fla. Dist. App. 1981). The trial court instructed the jury on the issue of comparative negligence, and the jury found Whitehead himself was 67 percent negligent. The appellate court reversed, holding that Whitehead's conduct was no defense to malpractice, which is a distinct and subsequent injury. The court stated: "[C]onduct prior to an injury or death is not legally significant in an action for damages like this, unless it is a legal or proximate cause of the injury or death—as opposed to a cause of the remote conditions or occasion for the later negligence." 404 So. 2d at 379.

The trial court in *Spence v. Aspen Skiing Co.*, 820 F. Supp. 542 (D. Colo. 1993), instructed the jury on comparative negligence. Lynne Spence became dizzy while she was skiing because she failed to follow a special hypoglycemic diet that was prescribed by her doctor. During the course of her treatment, an emergency medical technician made an error in administering intravenous fluids to Spence, and Spence eventually lost partial use of her arm. The appellate court reversed the trial court, noting that it would be "inconsistent with the reasonable and normal expectations of both parties for the court to excuse or reduce the provider's liability simply because it was the patient's own fault that she required care in the first place." 820 F. Supp. at 544.

The instant case is similar to *Whitehead* and *Spence*. Dr. Thomas reviewed the CT scan when he first arrived at the ER. John W. Barrett, M.D., the Huffman's expert, testified that "the results of a CT scan which had shown that there was clearly blood in the chest, and I think that yes, a chest tube should have been inserted as soon as they knew that there was a significant amount of blood in the chest." Dr. Thomas' ordering of the aortogram at 3 p.m. did not meet accepted standards of medical practice. Dr. Barrett also testified that not inserting the chest tube until 4 p.m. did not meet accepted standards of medical care. Dr. Barrett said, "[T]he chest tube should have gone in, the source of bleeding should have been recognized, he [Dr. Thomas] should have taken him [Robert] to

the operating room to control the source of bleeding within his chest."

By the time that Dr. Thomas decided to take Robert to the operating room, Dr. Barrett estimated that Robert's chances of survival had gone from 80-85 percent to 5 percent. Dr. Thomas owed Robert the same level of care that he owed to every patient. This was noted by the trial judge, who stated that this case "depends on whether or not this physician departed from appropriate standards of medical care, and these injuries occurred before that decision was made."

Even if the trial court would have decided differently, it does not appear that Dr. Thomas could prove Robert's comparative negligence. Dr. Thomas offered the testimony of Charles Edgar, the owner of the transmission shop where Robert was employed. Edgar testified that although he did not see the accident, he believed that the truck would not have fallen without negligence on Robert's part. There was no proof that Robert was negligent in any manner. Without this proof, Dr. Thomas' claim of comparative fault fails. The trial court did not err in excluding the issue of Robert's comparative fault.

### Directed Verdict on Pecuniary Damages

Dr. Thomas claims that the Huffmans failed to establish the nature and extent of the pecuniary damages they sustained as a result of Robert's death. Dr. Thomas specifically points to the fact that the Huffmans' economic expert, Dr. Ward, did not testify at trial.

In ruling on a motion for a directed verdict, the trial court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought. Where reasonable minds could reach different conclusions based on the evidence, the motion must be denied. A similar analysis must be applied by an appellate court when reviewing the grant or denial of a motion for a directed verdict. *T.S.I. Holdings, Inc. v. Jenkins*, 260 Kan. 703, 714, 924 P.2d 1239 (1996).

"Pecuniary loss or damages in a wrongful death case should be equivalent to those pecuniary benefits or compensation that rea-

sonably could have been expected to have resulted from the continued life of the deceased." *Laterra v. Treaster,* 17 Kan. App. 2d 714, 726, 844 P.2d 724 (1992). It allows a parent to recover "benefits which the parents may reasonably be expected to receive from him" as an adult. *Laterra,* 17 Kan. App. 2d at 726. Kansas courts have long recognized that parents may recover pecuniary damages for the death of their majority age children. *Railway Co. v. Fajardo,* 74 Kan. 314, 324, 86 Pac. 301 (1906). The issue currently before the court involves the amount of proof necessary to support an award of pecuniary damages.

Dr. Thomas relies on *McCart v. Muir,* 230 Kan. 618, 641 P.2d 384 (1982), to support his position; however, the Kansas Supreme Court in *Wentling v. Medical Anesthesia Services,* 237 Kan. 503, 701 P.2d 939 (1985), established a more flexible standard for determining pecuniary loss than the one stated in *McCart.* Plaintiffs in wrongful death actions are not required to prove their losses with mathematical certainty. In many instances, the burden of proof can be satisfied simply by showing the nature and extent of the loss asserted. This would include evidence that the decedent regularly cooked, cleaned, or maintained the home. The jury is presumed to be capable of converting the losses into monetary equivalents on the basis of their own experience and knowledge. 237 Kan. at 510.

The *Wentling* decision was cited favorably in *Cerretti v. Flint Hills Rural Electric Co-op Ass'n,* 251 Kan. 347, 837 P.2d 330 (1992). The court specifically stated that a jury is not bound by expert economic testimony. The trier of fact need only estimate the loss. 251 Kan. at 363.

Robert Huffman was 22 years old. He lived at home with his parents. Richard, his father, is disabled and unable to work. Karen, his mother, is a double amputee. Richard testified that Robert helped around the house and the yard, trimming and cutting down dead trees. Robert also remodeled the family bathroom. Robert helped his mother by doing laundry and other household chores. He also helped her with heavy lifting and other tasks that Karen was unable to perform, and he contributed money for household expenses.

Both Richard and Karen testified about their loving relationship with Robert. The family spent a lot of time together in the evenings, watching basketball and talking. The Huffmans presented testimony from friends and neighbors who knew Robert. Alice Ward described Robert as a willing, friendly, and kind person. Susan Barnett testified that Robert was a "really caring person" who helped out around the house.

Kansas law is clear that the plaintiff does not need to prove the amount of pecuniary damages to any level of mathematical certainty. There is no requirement that an economist present expert testimony. In this case, the Huffmans presented evidence of Robert's contributions around the house, as well as the companionship he provided. The trial court did not err in denying Dr. Thomas' motion for a directed verdict.

### Sufficiency of Evidence for Award of Pecuniary Damages

Dr. Thomas argues that the $907,732.52 pecuniary damage award was not supported by sufficient evidence. Dr. Thomas also states that even if Robert provided services to his parents in the past, he would not be able to do so in the future, given the extent of his injuries and that had Robert lived, he might have been confined to a wheelchair.

When a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, it is not the function of this court to weigh the evidence or pass on the credibility of the witnesses. If the evidence, when considered in a light most favorable to the prevailing party, supports the verdict, it will not be disturbed on appeal. *Cerretti*, 251 Kan. at 361-62.

The issue of pecuniary damages was submitted to the jury in five separate categories: loss of services, loss of attention, loss of filial care, loss of protection, and funeral expenses. The jury was also instructed that the amount awarded for the first four damages should be equivalent to the monetary benefits or compensation that the Huffmans could have expected to receive from Robert in the future.

There was sufficient evidence to support the jury's award of pecuniary damages.

*Directed Verdict on Issue of Causation*

Dr. Thomas claims that the Huffmans failed to present expert testimony showing that Dr. Thomas' negligence contributed to Robert's death.

In ruling on a motion for a directed verdict, the trial court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought. Where reasonable minds could reach different conclusions based on the evidence, the motion must be denied. A similar analysis must be applied by an appellate court when reviewing the grant or denial of a motion for a directed verdict. *T.S.I. Holdings, Inc.,* 260 Kan. at 714.

In order to prevail in a medical malpractice action, a plaintiff must prove three elements: (1) A duty was owed by the physician to the patient; (2) the duty was breached; and (3) a causal connection existed between the breached duty and the injury sustained by the patient. Every physician has the duty to use reasonable care and to exercise that reasonable degree of learning, skill, and experience which is ordinarily possessed by other physicians in the same or similar locations. In a medical malpractice action, expert testimony is required to show that the physician breached the standard of care. *Heany v. Nibbelink,* 23 Kan. App. 2d 583, 586-87, 932 P.2d 1046 (1997).

The Huffmans' expert, Dr. John Barrett, director of the trauma department at Cook County Hospital in Chicago, based his opinion in part on a Combined History and Physical/Death Summary that was dictated by Dr. Thomas as attending physician. As an attending physician, Dr. Thomas owed Robert a duty of care and Dr. Barrett testified that Dr. Thomas' failure to get Robert to the operating room constituted a deviation from the standard of care. The only question remaining is whether this deviation caused Robert's death.

Dr. Barrett testified that when Robert arrived at the Providence ER he had an "excellent chance of survival." Dr. Barrett placed Robert's survival chances at 80 to 85 percent. Dr. Barrett believed that Robert bled to death from numerous sources of internal bleed-

ing and that the bleeding could have been controlled by performing surgery.

The trial court correctly denied Dr. Thomas' motion for a directed verdict. Dr. Barrett provided testimony that the jury could have relied upon in finding a causal nexus between Dr. Thomas' negligence and Robert's death. The issue of causation was disputed. Thus, a directed verdict was not appropriate, and the trial court did not err in denying Dr. Thomas' motion for a directed verdict.

## Juror Misconduct

Dr. Thomas argues that jurors improperly considered attorney fees they felt would be deducted from the award when arriving at the amount of pecuniary damages owed to the Huffmans.

Juror misconduct which results in prejudice to a litigant and impairs his or her right to a fair and impartial trial requires a new trial. It is for the trial court to determine whether misconduct on the part of the jury has resulted in prejudice to a litigant. The trial court's judgment will not be overturned absent a manifest abuse of discretion. *State v. McGraw*, 19 Kan. App. 2d 1001, 1013, 879 P.2d 1147 (1994).

Dr. Thomas' motion for a new trial states that an affidavit from juror Cheryl Lang, as well as a sworn statement from defense attorney Sally Howard, establish juror misconduct. Dr. Thomas contends that both statements indicate that jurors impermissibly increased the damage award to account for attorney fees. Unfortunately, neither Lang's nor Howard's affidavits is in the record on appeal. Assertions in an appellate brief are not sufficient to satisfy inadequacies in the record on appeal. *Smith v. Printup*, 254 Kan. 315, 353, 866 P.2d 985 (1993). In Dr. Thomas' reply to the Huffmans' memorandum in opposition to his motion for judgment notwithstanding the verdict or new trial, an affidavit from juror Arturo Garcia was included. It states that in "considering the amount of *nonpecuniary* damages to be awarded . . . the jury accounted for the fact that the Huffmans would not receive the entire amount awarded. Specifically, the jury considered that at-

torney fees, taxes, medical expenses and funeral bills would be reduced from the damages awarded." (Emphasis added.)

The Huffmans countered with nine affidavits stating that attorney fees were not included in the pecuniary damage award. Charles Gambill, the presiding juror at the trial, specifically discounted the sworn statement given by Sally Howard. Two jurors stated in their affidavits that jurors Cheryl Lang and Arturo Garcia disagreed during most of the deliberations. The trial court did not err in refusing to grant a new trial based on juror misconduct. There was no abuse of discretion.

Affirmed.