NOT DESIGNATED FOR PUBLICATION

No. 117,839

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

BUILDING ERECTION SERVICES COMPANY, INC.,
*Appellant*,

v.

WALTON CONSTRUCTION COMPANY, INC. and
AMERICAN HOME ASSURANCE COMPANY,
*Appellees*.

WALTON CONSTRUCTION COMPANY, INC.,
*Appellee*,

v.

BUILDING ERECTION SERVICES COMPANY, INC.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; KEVIN P. MORIARTY, judge. Opinion filed July 20, 2018.
Reversed.

*R. Scott Beeler* and *Carrie E. Josserand*, of Lathrop Gage LLP, of Overland Park, and *Kurt S. Brack*, of Brown & Ruprecht, of Kansas City, Missouri, for appellant.

*Danne W. Webb*, of Horn Aylward & Brandy, LLC, of Kansas City, Missouri, for appellee.

Before GARDNER, P.J., PIERRON, J., and WALKER, S.J.

PIERRON, J.: This case concerns problems with the construction of a press box at the University of Kansas (KU) Memorial Stadium almost 20 years ago. It now comes

1

before this court for a third time. On the first appeal, the court held that Building Erection Services Company, Inc. (BESCO), one of the subcontractors on the project, was contractually obligated to indemnify Walton Construction Company, Inc. (Walton), the general contractor and assignee of KU's indemnification rights, for remediation damages, attorney fees, and expenses because BESCO failed to anchor a glass curtain wall system to the press box substructure in accordance with shop drawings. This court reversed the district court's order that BESCO pay all the remediation costs as damages and remanded for the district court's "determination of those damages that arose out of, or resulted from, BESCO's negligent acts or omissions." *Building Erection Services Co., Inc. v. Walton Const. Co., Inc.*, No. 100,906, 2009 WL 4639486, at *6-7 (Kan. App. 2009) (unpublished opinion) (*BESCO I*).

On remand, the district court conducted a second evidentiary hearing and assessed half the costs of removing the metal wall panels and glass that comprised the press box's curtain wall to BESCO.

On a second appeal, the court held substantial competent evidence did not support an assessment of half the remediation costs to BESCO. The court also reversed the attorney fees award, finding it was not supported by substantial competent evidence. *Building Erection Services Co., Inc. v. Walton Const. Co., Inc.*, No. 111,706, 2015 WL 4879075, at *19-21 (Kan. App. 2015) (unpublished opinion) (*BESCO II*).

On the second remand, the district reinstated the award assessing half the glass removal costs and increased the award for the metal panel removal costs to 85% with no new evidence from Walton. The district court also reinstated the reversed attorney fees award. BESCO appeals, arguing the district court failed to comply with *BESCO II*'s mandate and substantial competent evidence does not support the third damages award.

2

The press box design included a glass curtain wall with a metal wall panel system to provide support. After completion, the press box was discovered to have two problems: water was infiltrating the curtain wall, and the curtain wall was not properly fastened to the press box's structural steel. These errors have resulted in years of litigation between KU, Walton, and BESCO. The case is now before us on its third appeal.

*First Trial*

The first trial established the underlying facts, as set forth in *BESCO I*:

"On June 29, 1998, the University of Kansas (KU) and Walton signed a nearly $13 million construction contract to renovate KU's Memorial Stadium press box. BESCO signed a subcontract with Walton in August 1998 for BESCO to assemble the press box's structural steel, install aluminum door hardware, install glazing of operable windows, and install steel reinforcing of the glass curtain wall. Another of Walton's subcontracts for other work on the project was Cosentino Contracting, Inc. (CCI).

"During the first test of the stadium press box on August 6, 1999, considerable water leakage was discovered. On September 29, 1999, Walton wrote CCI stating that the leakage on the east side of the building occurred at 'your' panels and needed to be resolved 'ASAP.' Walton also stated: 'These costs and damage are the responsibility of Cosentino Contracting Inc.'

"Because Walton was unable to correct the water leakage problem, KU hired Slemmons Associates Architects, P.A. (Slemmons) in association with Engineering Diagnostics, LLC (ED) to study the problem. The Slemmons report of June 13, 2000, determined that the water leaks in the east elevation curtain wall were due to failed internal window seals, failed seals at metal panel splices, sealant failure of various panel joints, and lack of seals around camera catcher bolt holes. The west elevation curtain wall had failed internal window seals, the subsill flashing did not have functional end dams, and sealant in some joints was not properly applied. ED's report noted that wood screws were not fully engaged with the wood blocking at one window anchor, and 'recommend [ed] that the window manufacturer review the structural adequacy of the wood screws.' There is no evidence in the record on appeal that the window manufacturer was contacted concerning the structural adequacy of the wood screws.

3

"The Slemmons report assigned the responsibility for the water problem and repair cost as follows: KU was 10 percent responsible because of 'the project's compressed time schedule'; the architect was 10 percent responsible 'because their exterior wall system did not incorporate redundant seals that could have reduced the building's weather infiltration problems'; and Walton was 80 percent responsible because of 'failure of internal seals within the widow system; failed seals at metal panel splices; improper sealant installation; lack of seals around camera catcher bolt holes; and lack of end dams at subsill flashing.'

"Daniel Miller of BESCO testified that during the August 6 test, the curtain wall did not leak. He stated that the splash plates of the panel system leaked because the windows were not properly sealed internally when they came from the manufacturer, EFCO. EFCO sent technicians to KU to reseal the operable vents. Miller discovered that water was coming in from the 7-inch splashes and draining into the top of the window. In a letter to Mary Ann Elliot at Walton, Miller asked what was 'being done to prevent the water penetration into the top of our systems.' BESCO sent a letter to Walton on October 11, 1999, stating that the 7-inch system was inadequate to meet wind load requirements and was replaced with a 9-inch system, which should have initially been installed. The metal panel system and the J-channel was installed by CCI.

"James Modig, KU's director of design construction management and an architect, testified that the project architect, GLPM, and the engineer of record forwarded their concerns about the water leaks to Walton 'with the expectation that they would address that issue.' Walton responded by defending its work, saying: 'We have some issues with the design that was outside of our control. That's why your building may be leaking.

"Initially, because of the water infiltration, KU withheld a $422,209 payment to Walton, which included $26,548.54 that Walton still owed BESCO. Because Walton did not receive its payment from KU, Walton did not pay BESCO.

"On June 10, 2002, BESCO sued Walton, KU, the State of Kansas, and American Home Assurance Company (American), Walton's bonding company, for breach of contract, claiming that BESCO performed its contract and was entitled to its payment. In turn, each defendant denied liability and asserted cross-claims against the others.

"The 2000 Slemmons report was given to Walton in January 2002. In January 2004, KU hired ED, the same company who had previously participated in the 2000

4

Slemmons report, to determine the extent of the water damage. ED's report of February 9, 2004, stated: 'The intent of this updated report is to identify water infiltration sources, extent of the water infiltration, and responsibility for the water leaks.' The conclusions and recommendations in the report stated that the internal metal-to-metal joint impairment 'is probably due to improper installation of internal seals.'

"The ED report also noted problems with the metal panel splices that affected water drainage, the sealant which 'provides a critical function in preventing building water infiltration' was not properly installed in some areas, and there was water infiltration around the camera catcher bolt holes. ED also found a failure of internal seals within the curtain wall system and lack of end dams at the subsill flashing.

"While the 2004 test for water infiltration was being conducted, interior walls were exposed, and it was noted that screws holding the windows in place did not penetrate into the metal structure of the press box. Robert Rombach, an architect and special project manager for KU, discovered that the screws were wood screws and not stainless steel. More than 3 years after completion of the press box, KU's engineering consultants indicated that the screws required immediate remediation even though ED's report noted only that the window manufacturer should 'review the structural adequacy of the wood screws.' The ED report did not state or infer that the wood screws were responsible for any of the water infiltration.

"In February 2004, CCI was contacted by GLPM architects to develop the repair protocol necessary to stop 'the persistent leaking' of the press box. Much of their protocol dealt with sealants.

"On April 9, 2004, e-mails were sent between Chris Burger, lead attorney for KU, Ken Conrad, a consultant for KU and a structural engineer, Rombach, Craig Penzler, the project architect at KU, David Dunfield, and Modig regarding the pending litigation. Burger's e-mail stated:

> 'As I understand, the improper construction and installation of the
> fasteners is not necessarily a cause of the water infiltration, but is a
> serious defect which requires repair. Remediation of the water infiltration
> and the fasteners will overlap, and it therefore seems prudent to include
> them together in the same bid package.

'The question which the owner will need to answer is whether the State/KU desires to have an opportunity to try to recover its costs. If the answer is in the affirmative, the fasteners should be included.

'If included, please separate the two for cost purposes.'

"KU contracted with Ferrell Construction of Topeka for remediation of the press box. Ferrell completed the combined remediation work for about $730,000. BESCO was hired as one of the subcontractors on the remediation work.

"During two depositions in June 2004, Walton first learned of BESCO's improper screw anchoring. Walton then sent BESCO a letter on June 22, 2004, demanding BESCO 'indemnify Walton from any and all claims related to these issues.' In response, BESCO sent Walton a letter claiming it installed the glass curtain wall with fasteners provided by the manufacturer and refused to indemnify Walton. On July 9, 2004, Walton again requested BESCO indemnify it in the event BESCO's performance exposed Walton to any liability. BESCO again refused Walton's request.

"In March 2005, Walton, American, KU, and the State of Kansas entered into a settlement agreement. The agreement stated that Walton 'resisted vigorously KU's claims and sought to defend the work performed by its own personnel and its subcontractors, including BESCO.' It then stated that evidence produced by KU 'caused Walton, however, to reevaluate its position and to acknowledge liability to KU for breach of contract as a result of the defective work performed by BESCO.' The agreement did not address any defective work by Walton or any other subcontractor. Walton agreed to pay KU $639,551. In the agreement, KU assigned any claims it may have had against BESCO to Walton. In paragraph 12 of the agreement, it states: 'This Agreement is solely for the benefit of Walton and KU, and their successors and assigns as defined herein, and is not intended to be relied upon by or to benefit, for any purpose, any other person or entity.' No subcontractor was a party to this agreement.

"In June 2005, Walton filed a separate indemnification action against BESCO requesting its damages in the amount of $594,550, KU's damages in the amount of $298,880.34, prejudgment and postjudgment interest, and attorneys fees.

"BESCO filed a motion to dismiss, claiming that Walton could only prevail if the district court made a finding that BESCO was negligent, and if Walton's claim were one for negligence, it was now barred by the statute of limitations.

"The district court consolidated BESCO's 2002 claim and Walton's 2005 claim and set the case for trial.

6

"After a 4-day trial with over 500 exhibits, the district court concluded that BESCO was not entitled to a portion of its final payment because the architect did not certify that BESCO performed in accordance with its subcontract, and BESCO failed to install the glass curtain wall as designed. The district court determined that the contract's 'negligent acts or omissions' language is 'a commonly used term.' Thus, Walton did not need to bring a negligence claim against BESCO to collect under the contract; it only needed to show 'some negligent act or omission.'

"The district court found that BESCO's work was not 'free from defects' as required by [its] contract. Therefore, BESCO breached the contract by delivering defective work.

"The district court refused to apportion damages, stating that had this case solely concerned water infiltration remediation, a damage apportionment may have been appropriate. The district court held,

'The Court is persuaded that the structural fastener and anchorage issues were the responsibility of BESCO, and that while other, related or unrelated problems may have caused the press box to leak in the first place, the ultimate "fix" was necessary as a direct and proximate result of BESCO's failure to follow the plans and specifications for the job.'

"The district court awarded Walton $894,430.34 in damages against BESCO but subtracted the retainage Walton withheld from BESCO on the structural steel subcontract and retainage amounts Walton withheld from two other subcontractors. The district court also awarded Walton attorney fees, and BESCO its attorney fees incurred while pursuing the steel contract retainage. In separate orders, the district court denied Walton's request for prejudgment interest and granted BESCO's request for prejudgment interest. On June 23, 2008, the district court entered its final order awarding a total of $1,085,505.12 to Walton after figuring in various set-offs. Walton and BESCO appeal[ed]." 2009 WL 4639486, at *1-4.

BESCO I

The *BESCO I* court affirmed the district court's holding that "Walton was entitled to indemnification from BESCO" based on this indemnification provision from the Walton and BESCO contract:

7

"'To the fullest extent permitted by law, [BESCO] shall indemnify and hold harmless [Walton] from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of [BESCO's] Work under this Subcontract, . . . but only to the extent caused in whole or in part by negligent acts or omissions of [BESCO], regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder.'" 2009 WL 4639486, at *5.

At the same time, the court reversed the district court's assessment against BESCO of all the remediation damages agreed to by KU and Walton under their settlement agreement. 2009 WL 4639486, at *7.

"Here, in interpreting the plain language of the indemnification clause of the contract between Walton and BESCO, it is clear that BESCO agreed to indemnify Walton against all claims arising out of BESCO's performance '*only to the extent caused in whole or in part by negligent acts or omissions of*' BESCO. [Emphasis added.]

"It is the district court's function to determine the amount of damages awarded to a party, based upon evidence of the loss suffered. The district court makes this reasonable estimate based on the best evidence obtainable under the circumstances. *Cerretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, 362, 837 P.2d 330 (1992).

"Here, the district court ordered BESCO to pay all of the loss Walton agreed to be responsible for in its settlement agreement with KU, regardless of whether BESCO's actions actually caused the damages. Although the district court held 'the ultimate "fix" was necessary as a direct and proximate result of BESCO's failure to follow the plans and specifications for the job,' there is no evidence in the record on appeal that ties Walton's requested damages, or the total cost of remediation, to BESCO's failure to follow the correct shop drawings.

"It was undisputed that KU withheld the retainage payment because of water infiltration in the press box. However, the district court did not determine that BESCO's failure to use the appropriate size of screw caused, or contributed to, the water infiltration. The remediation work was initially started only because of the extensive

8

water infiltration, in which both the Slemmons and ED reports did not attribute any fault to BESCO.

"The district court's award of all of the damages against BESCO is not supported by either the indemnification language in the contract between BESCO and Walton, or the record on appeal.

"Accordingly, the district court erred in assessing all of the damages against BESCO. We reverse and remand this issue to the district court for a determination of those damages that arose out of, or resulted from, BESCO's negligent acts or omissions." 2009 WL 4639486, at *6-7.

*Proceedings on First Remand*

The parties disagreed on the extent of the mandate in *BESCO I*. BESCO argued the appellate court had found Walton had failed to prove damages based on the original record, and the district court had to enter an award in favor of BESCO. Walton disagreed, arguing the original record could support a damages award in favor of Walton, and the district court could hear more evidence on the matter.

The district court held another evidentiary hearing. Robert Rombach, KU's special project manager, testified for Walton. Rombach's testimony, based on his onsite observations of the construction and remediation projects, covered these key points:

"[T]he remediation of the press box was best and most appropriately handled from the outside of the press box suites rather than from inside the suites."

"[T]o fix the fastener issues, it was necessary to remove the metal panels and the glass and glazing system to gain access to the areas where the fasteners had to be replaced."

"[T]he glass itself had to be taken out so it could be shifted over to avoid contact with the metal components of the press box system."

9

"[W]hile the fasteners were replaced, the remediation contractors were able to access and address the water infiltration issues."

"[A]mong the water infiltration issues that were addressed were the end dams which were part of BESCO's initial scope of work."

"[T]he vast majority of the remediation costs were incurred by the University of Kansas to address the fastener issues which allowed the simultaneous correction of the water infiltration problems."

Rombach admitted that the majority of the work to remediate the fastener issue could have been done from inside the press box. Because of certain structural impediments, though, some of the work had to be done from the outside, requiring removal of the metal panels and glass. The suites within the press box were completely finished and would have had to be demolished to do the remediation work from inside.

Rombach went through specific figures he attributed to BESCO's defective work. He concluded the minimum amount of damages that should be attributed to BESCO was $480,078. This included the costs of removing the glass but not the metal panels. Rombach testified the metal panel removal costs could be attributed to "work that needed to be done to address the curtain wall system and the anchorage issues." He had not included these costs in his damages estimate to give a more conservative estimate.

William Miller, BESCO's president at the time of the project, testified for BESCO and denied that BESCO was responsible for any of the remediation damages. He testified that the fastener issue could have been fixed from the inside the press box and denied having anything to do with the work causing the water infiltration problems.

In a memorandum decision the district court made these factual findings and conclusions of law, mostly citing the remand hearing and the parties' proposed findings:

10

"The majority of the remediation costs were incurred by [KU] to address the fastener issues, which allowed the simultaneous correction of the water infiltration problems."

"[T]he anchorage issues had nothing to do with the water infiltration issues."

"[T]he glass systems had to be taken apart to access the fastener issues from the outside, and the structural repair work could not have been done without removing the glass panels."

"While the fasteners were being replaced, the remediation contractors were able to access and address the water infiltration issues."

As for the damages calculation, the disputed remediation figures centered on three categories: the glass removal; the metal panel removal; and Ferrell Construction's structural protocol work to fix the fasteners. The district court held that BESCO was liable for half the glass removal costs, explaining:

"BESCO should be liable for a percentage of the cost of the glass removal. While BESCO submitted testimony that the fasteners could have been fixed from the inside, it did nothing to suggest this alternative method or oppose the simultaneous remediation of the fasteners and water issues [in performing its separate subcontract with Ferrell for the remediation work]. Therefore, the Court will not deduct the full cost of glass removal, which was $387,947. However, this court will apportion BESCO only half of the cost of the glass removal [$193,973.50], which had to be done to fix the water remediation issue as well."

The district court also found that "half the cost of the removal of the . . . metal panel should be attributed to BESCO, in the amount of $114.823.50, for the same reasons that the full cost of the glass removal was not deducted." The court assessed $50,841 for Ferrell's structural protocol work to BESCO, finding it "represent[ed] the cost of remediation for BESCO's errors regarding the fasteners."

11

The district court entered a final judgment awarding Walton a total of $897,711.81 in damages. That amount included: $255,171.70 in KU's attorney fees; $43,707.71 in KU's costs; $250,000 in Walton's attorney fees up through the first trial; and $55,709 in Walton's attorney fees from April 22, 2008, to October 21, 2013. BESCO appealed after the district court summarily denied its motion to alter and amend the judgment.

BESCO II

The *BESCO II* court held that the district court was within the mandate of *BESCO I* to hold another evidentiary hearing. 2015 WL 4879075, at *15. But the court also held that substantial competent evidence did not support the district court's 50-50 apportionment of the metal panel and glass removal costs, explaining:

"The issue on remand was the extent to which BESCO was answerable for the costs of remediation. In short, the trial court apportioning the damages at 50-50 between BESCO and Walton was an unreliable approximation of BESCO's responsibility which the trial court should not have relied upon in computing damages. For example, Ferrell charged $50,841 for the cost of fixing BESCO's fasteners problem. As a result, we determine that substantial competent evidence does not support the trial court's ruling that BESCO should be responsible for half of the costs for removal of the metal wall panel system.

. . . .

"For the same reasons discussed earlier in response to BESCO's arguments about the metal wall panel system, we determine that substantial competent evidence does not support the trial court's ruling that BESCO should be responsible for half of the costs of removing the glass.

"In summary, BESCO's subcontract with Walton required BESCO to indemnify and hold harmless Walton from and against claims, damages, losses and expenses, including but not limited to attorney fees, arising out of or resulting from performance of BESCO's work under the subcontract, but only to the extent caused in whole or in part by

12

negligent acts or omissions of BESCO, regardless of whether or not such claim, damage, loss or expense was caused in part by a party indemnified. The remediation work was started because of the water infiltration problem. The Slemmons report opined that Walton was 80 per cent at fault for the water infiltration problem. This water infiltration problem predated the discovery of the problem with BESCO's fasteners. Moreover, the water infiltration problem was not within the scope of the work under BESCO's subcontract. As a result, the trial court should have apportioned the costs of remediation on the basis of the claims that arose from or were attributable to Walton's and BESCO's respective scope of work based on the indemnity provision under BESCO's subcontract." 2015 WL 4879075, at *19.

The *BESCO II* court also reversed the attorney fee award:

"KU's attorney-fee itemization spans more than 150 pages and includes a significant amount of work conducted from April 2003 up until the fastener problem was discovered in 2004. The same is true of Walton's attorney-fee itemization. Walton offers no explanation for how BESCO is liable for it or KU's assigned attorney fees and costs incurred before anyone even realized that there was a problem with BESCO's work. Such a conclusion would violate the law of the case established in *BESCO I*. Likewise, the trial court offers no explanation for why it only assessed half of the remediation damages to BESCO but ordered it to pay all of KU's and Walton's attorney fees and costs.

"As a result, we reverse that portion of the trial court's judgment that orders BESCO to pay Walton's and KU's attorney fees and expenses. We remand with directions to determine what portion of those fees and expenses that were attributable to the contracted work performed by BESCO that fell under the indemnity provision of BESCO's subcontract." 2015 WL 4879075, at *21.

*Proceedings on Second Remand*

The district court declined to take new evidence, but the parties again disputed the scope of the *BESCO II* mandate. Walton argued that *BESCO II* held that substantial competent evidence did not support a 50-50 apportionment of the metal panel and glass

removal costs but had affirmed Walton's right to indemnification. Walton suggested that the reason the *BESCO II* court did not affirm the second damages award was because Walton had failed to explain why a 50-50 apportionment was appropriate. Walton offered that if it was simply a matter of providing a better explanation, then the district court could reach the same result on the second remand. Walton added that the "scope of work" approach was too narrow, and it should be able to recover the costs to correct BESCO's work.

BESCO argued that *BESCO II* not only reversed the second damages award, but it also held that Walton could not recover *any* damages arising from the costs of removing the metal panels or glass. At most, Walton could only recover the costs incurred to fix the fastener issue. By BESCO's calculation, this amount was less than the amount Walton owed BESCO for other work BESCO had performed. BESCO reasoned that this meant Walton was not the prevailing party on appeal and should not receive attorney fees.

After briefing and argument, the district court found in Walton's favor in a memorandum decision. The court reaffirmed its previous factual findings after the first trial, including that "BESCO did not perform its work in accordance with Contract Documents" and "BESCO's failure to install the system as designed created a life safety issue which required remediation of the press box." The court also reaffirmed its findings after the first remand. The court explained:

> "The key issue in this case is that the curtain wall of the press box was immediately remediated because of a pervasive public safety concern—not because of water infiltration. But for the water infiltration, the anchorage issues would not have been discovered until after a likely fatal disaster triggered an investigation."

According to the district court, *BESCO I* and *BESCO II* had paid too much attention to the water infiltration issue. It used the following analogy to clarify its point:

14

"A homeowner purchases a newly-constructed home in a new development. A year after the homeowner moves in, he notices that the floor is particularly squeaky with every step he takes. He contacts the builder to address the problem. The builder's solution is to secure the floorboard to the floor joists by adding more nails. The nails prevent the plywood from squeaking, but it is only a cosmetic remedy. After a while, the floor once again begins to squeak. This time the homeowner calls a different contractor to fix the squeakiness. In the process of fixing the squeaky floor, the repair person discovers that the floor joists are only 2x4 boards, not the 2x10 boards as required by the plans. The issue is no longer the squeaky floor, but the structural integrity and safety of the home.

"BESCO's failure to abide by the most up-to-date plans is akin to using the 2x4 boards instead of the 2x10 boards. BESCO's responsibility for the water infiltration is now secondary. Prior to discovering the anchorage issues, BESCO may have only been responsible for the areas where the water infiltration occurred. Instead, BESCO's negligence required remediation of the entire curtain wall because the anchorage issues were system-wide."

According to the district court, the appellate court had misunderstood the relevance of the Slemmons report. The district court explained the determinative issue was whether Walton had "satisfactorily proved that the renovations were caused in whole [or] in part by BESCO's failure to use the correct shop drawings to install the curtain wall system." On this point, the Slemmons report was irrelevant because it found Walton 80% at fault for the water infiltration issue, but it considered no parties' fault for the fastener issue. BESCO's fault for the fastener issue could not be reliably computed into Walton's share of fault for the water infiltration problem.

The district court noted that the appellate court had twice found that substantial competent evidence did not support the district court's damages award. It added, "This is the current law of the case, but this Court finds the Court of Appeals' decisions difficult to reconcile with [the] findings of fact set forth above." The district court reiterated that BESCO did not follow the contract and "should be held responsible for that failure."

15

After the district court's extensive critique of the *BESCO II* decision, the court determined that BESCO was responsible for 85% of the metal panel removal costs:

"The Slemmons report was intended to determine the liability of the parties for the water infiltration issue only. The report made a short note that there was an issue with the anchorage of the curtain wall system. Four years passed. The University was aware of the water infiltration issue during this four year period. But it was not aware of the anchorage issue resulting from BESCO's work. After performing deconstructive testing in certain suites in 2004, Mr. Rombach and the University's engineers and architects learned of the full scale of the anchorage problems by BESCO's reliance on out-of-date shop drawings.

"This discovery made the remediation effort much more urgent, and the anchorage issues were the main focus of remediation. The water infiltration issue was no longer important. The anchorage issues meant the structure was unstable and represented a public safety hazard that had to be fixed immediately. Otherwise, the University risked the death of its own patrons. The metal panels had to be removed and worked on from the outside, not the inside to fix BESCO's errors. Mr. Rombach testified that because '85 to 95 percent of the metal panels were removed in the remediation proves, "one could attribute the removal of the metal panel system to work that needed to be done to address the curtain wall system and the anchorage issues," which were within the scope of BESCO's work.' *BESCO II*, at \*16. The Court finds Mr. Rombach's testimony to be credible and persuasive. Accordingly, BESCO shall pay Walton 85 percent of the costs relating to the Zahner metal panels, or $195,199.95."

The district court held that BESCO was liable for half the glass removal costs:

"This court included testimony from Mr. Rombach in its findings of fact from the first trial. Mr. Rombach was physically present during the 2004 remediation project where the University aimed to remediate BESCO's fastener issues. He personally observed the remediation project. According to this testimony, he watched 90 percent of the remediation on the center section of the press box, and 30 percent of both the north and south portions of the press box. This means Mr. Rombach personally observed 50 percent

16

of the remediation project overall. During the entire time he observed the remediation, he never saw a single penetration of any screw through the metal channel.

"This Court finds Mr. Rombach's testimony both credible and persuasive. Mr. Rombach observed the removal of at least 50 percent of the glass panels. He observed that none of the removed glass panels to be properly anchored as directed by the project engineer. Accordingly, BESCO must be responsible for at least 50% of the cost of the glass panel removal.

"The full cost of removing the glass panels was $387,947.00. BESCO shall pay Walton $193,973.50."

The district court recognized that the award for half the glass removal costs was the same one the *BESCO II* court reversed. It acknowledged that, "[o]ne may well argue that the law of the case under *BESCO II* is that this near-half amount is in error, and that this Court errs again by awarding the same judgment." It found that it did not violate the law of the case doctrine because the "Law of the Case is a discretionary and public policy-oriented doctrine that aims toward efficient and final litigation." As the district court explained, "This case has been anything but final."

The district court entered a journal entry of final judgment assessing $991,238.50 in damages in favor of Walton against BESCO. The court reached that amount through this calculation:

| | |
|---|---|
| $398,882.45 | Actual remediation costs after deducting setoffs agreed upon by the parties |
| $20,408.50 | Percentage of remediation contractor's overhead attributed to BESCO |
| $255,171.70 | KU's attorney fees |
| $43,707.71 | KU's costs |
| $250,000 | Walton's previously awarded attorney's fees |

17

| | |
|---|---|
| $55,709 | Walton's attorney's fees from April 22, 2008, to October 21, 2013 |
| $17,743.52 | Walton's attorney's fees from October 21, 2013, to November 15, 2016 |
| ($25,256.22) | Retainages from other subcontractor's work and BESCO's steel contract |
| ($25,128.06) | Interest on steel retainage |

BESCO appeals.

*Law of the Case and Mandates of Prior Appeals*

We will first determine if the district court failed follow the law of the case and the mandates of prior appeals in entering an award of damages and attorney fees.

BESCO argues the district court ignored the law of the case and violated the mandate in *BESCO II* when it determined the third damages award. BESCO interprets *BESCO I* and *II* as holding that BESCO was not liable for: (1) work made necessary by the water infiltration issue; (2) all the remediation costs; and (3) any of the costs of removing the metal panels and glass. BESCO asserts these holdings are now the law of the case. BESCO argues that the district court ignored these holdings when it awarded Walton 85% of the metal panel removal costs and 50% of the glass removal costs

Walton responds that the law of the case doctrine is discretionary, and the district court may "evaluate the case outside of the 'law of the case.'" Walton reiterates the district court's conclusion that "this case has been anything but final," and the appellate court may have overlooked some facts. But Walton emphasizes that both *BESCO I* and *BESCO II* affirmed BESCO's obligation to indemnify Walton, and the only matter left to determine is the extent of damages. Walton contends the district court carried out *BESCO*

18

*II*'s mandate by explaining in detail how and why the evidence supported its damages award.

*Standard of Review*

"Whether the law of the case doctrine barred a party from relitigating an issue is a legal question over which an appellate court has unlimited review." *State v. Parry*, 305 Kan. 1189, 1194, 390 P.3d 879 (2017). Whether a district court complied with the mandate in a prior appeal is also a question of law over which this court has unlimited review. We review whether a district court has properly implemented the appellate court mandate for abuse of discretion. *Leffel v. City of Mission Hills*, 47 Kan. App. 2d 8, 15-16, 270 P.3d 1 (2011).

While the law of the case doctrine is discretionary, once a court has decided an issue, that issue should ordinarily not be relitigated or reconsidered unless clearly erroneous or manifestly unjust. *State v. Collier*, 263 Kan. 629, Syl. ¶¶ 2, 3, 952 P.2d 1326 (1998). Courts generally consider issues decided on a first appeal as settled law of the case in a second appeal in the same case. *Parry*, 305 Kan. at 1195. If a party fails to appeal a court ruling, it becomes the law of the case. See *Thoroughbred Assocs. v. Kansas City Royalty Co.,* 297 Kan. 1193, 1212, 308 P.3d 1238 (2013).

A subset of the law of the case doctrine is the mandate rule. *Collier*, 263 Kan. at 636; *Leffel*, 47 Kan. App. 2d at 15-16. Under the mandate rule, when an appellate court remands a case for further proceedings at the district court level, the district court must comply with the mandate and law of the case established on appeal. K.S.A. 20-108; K.S.A. 60-2106; *Collier*, 263 Kan. at 634-37. When an appellate court has decided an issue by explicit language or necessary implication, a district court may not reconsider the issue. *Leffel*, 47 Kan. App. 2d at 16.

19

BESCO II*'s Mandate*

In addressing damages, *BESCO II* reaffirmed these holdings from *BESCO I*:

- The evidence in the record "did not tie[] Walton's requested damages, or the total cost of remediation, to BESCO's failure to follow the correct shop drawings." *BESCO I*, 2009 WL 4639486, at *6.

- "The remediation work was initially started only because of the extensive water infiltration, in which both the Slemmons and ED reports did not attribute any fault to BESCO." *BESCO I*, 2009 WL 4639486, at *6.

- Neither the contract's indemnification language nor the record on appeal supported assessing all the costs of the press box remediation against BESCO. *BESCO I*, 2009 WL 4639486, at *7; see *BESCO II*, 2015 WL 4879075, at *10.

*BESCO II* held that substantial competent evidence did not support the district court's 50-50 apportionment of the metal panel and glass removal costs. *BESCO II* reversed and remanded "for further proceedings consistent with this opinion." 2015 WL 4879075, at *23. On remand, the district court could not, at the very least, enter a damages award of half the metal panel and glass removal costs unless Walton could produce new evidence tying those costs to BESCO's scope of work.

Walton produced no new evidence to tie the metal panel and glass removal costs to BESCO's scope of work. Even so, the district court again entered an award of half the glass removal costs and increased the award of the metal panel removal costs to 85%. In entering this award, the district court acted contrary to *BESCO II*'s mandate and the law of the case.

The district court acknowledged that its third damages award appeared inconsistent with *BESCO II*, but added that the law of the case doctrine was discretionary and this case was "anything but final." In reaching this conclusion, the district court erred in two ways. First, *BESCO II* became the law of the case after Walton failed to file a petition for review. So, while this litigation may be ongoing, *BESCO II* was final for purposes of the law of the case doctrine.

Second, the law of the case and the mandate rule required the district court to comply with *BESCO II.* Indeed, this situation appears to be the exact situation for which the law of the case doctrine was created. One purpose of this doctrine is to avoid indefinite relitigation of the same issue. *Collier*, 263 Kan. 629, Syl. ¶ 2. If the district court can simply reinstate an award overturned by the appellate court with no new evidence to support it, this litigation could in theory go on indefinitely. In any case, the mandate rule would prevent the district court from reconsidering the appellate court's ruling for any reason. See *Leffel*, 47 Kan. App. 2d at 16; 18B Wright, Miller & Cooper, Federal Practice & Procedure: Law of the Case § 4478 (2002 & 2018 Supp.). As a result, even if the district court disagreed with *BESCO II*, it still had to comply with *BESCO II*'s mandate and the law of the case.

Walton defends the third damages award by pointing out that the district court explained in detail its rationale for its assessment. While this award has a more extensive explanation than the second damages award, the evidence supporting the awards did not change. As the *BESCO II* court held, the evidence in the record does not support an award of half the metal panel and glass removal costs and the district court erred in assessing an award in that amount. 2015 WL 4879075, at *19.

The district court violated the law of the case and the mandate rule as to attorney fees. In the second damages award, the district court assessed attorney fees against BESCO in these amounts: $255,171.70 in KU's attorney fees; $43,707.71 in KU's costs;

21

$250,000 in Walton's attorney fees leading up to the first trial; and $55,709 in Walton's attorney fees from April 22, 2008, to October 21, 2013. *BESCO II* found that substantial competent evidence did not support these amounts. It noted the amounts included fees and costs for work performed before anyone discovered BESCO's defective work, and the district court had not reduced the amounts by BESCO's percentage of liability for the remediation costs. The *BESCO II* court reversed and remanded with directions "to determine what portion of those fees and expenses were attributable to the contracted work performed by BESCO that fell under the indemnity provision of BESCO's subcontract." 2015 WL 4879075, at *21. In the third damages award, the district court reinstated the attorney fees that *BESCO II* had reversed with no new evidence to support them. Thus, the district court also erred in awarding attorney fees in the third damages award.

Failure to comply with the mandate rule and the law of the case is reversible error. See *Collier*, 263 Kan. at 637. We reverse the award assessing half the glass removal costs to BESCO. Additionally, we reverse the attorney fees awards that the district court reinstated after *BESCO II*.

*Damages Award*

We will next consider if the district court erred in awarding damages to Walton for repairs not in BESCO's scope of work.

BESCO argues that substantial competent evidence does not support the third damages award, and the district court has ordered it to pay substantial repair costs unrelated to its scope of work. BESCO contends Walton has failed to ask for, and the district court has failed to enter an award for, what the contract permits. Here, that would be the actual cost to remedy BESCO's defective work. According to BESCO, that would be the cost to replace the fasteners. Because Walton has had three chances to prove damages and has failed three times, BESCO asks us to vacate the award.

22

Walton, on the other hand, argues substantial competent evidence does support the award. Walton claims BESCO is seeking to limit its liability by arguing it can be responsible for damages only if Walton can prove BESCO's defective work caused the water infiltration. Walton asserts this is wrong, and the record shows BESCO's failure to install the fasteners created a "life safety issue" requiring immediate system-wide remediation.

*Standard of Review*

As the *BESCO I* and *II* courts explained:

"'The basic principle of damages is to make a party whole by putting the party back in the same position as if the injury had not occurred, not to grant a windfall. [Citations omitted.]' *Rose v. Via Christi Health System, Inc*., 279 Kan. 523, 527, 113 P.3d 241 (2005).

"Here, in interpreting the plain language of the indemnification clause of the contract between Walton and BESCO, it is clear that BESCO agreed to indemnify Walton against all claims arising out of BESCO's performance 'only to the extent caused in whole or in part by negligent acts or omissions of' BESCO.

"It is the [trial] court's function to determine the amount of damages awarded to a party, based upon evidence of the loss suffered. The [trial] court makes this reasonable estimate based on the best evidence obtainable under the circumstances. *Cerretti* [, 251 Kan. at 362]." *BESCO I*, 2009 WL 4639486, at \*6.

"In reviewing a claim that the trial court's award of damages does not comply with these legal principles, this court must determine whether the trial court's factual findings are supported by substantial competent evidence and are sufficient to support the district court's conclusions of law. [*BESCO I*,] 2009 WL 4639486, at \*6 (citing *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 915-16, 157 P.3d 1109 [2007]). Substantial evidence is legally relevant evidence that a reasonable person might regard as sufficient to support a conclusion. To the extent BESCO's arguments challenge the trial court's

23

findings of law, this court has unlimited review. See 283 Kan. at 916." *BESCO II*, 2015 WL 4879075, at *16.

In *Peterson v. Ferrell*, 302 Kan. 99, 106-07, 349 P.3d 1269 (2015), the court held:

"On review, appellate courts do not reweigh evidence or pass upon the credibility of witnesses. When examining whether the evidence is insufficient to support a claim of damages because it is too conjectural or speculative, we examine the record in the light most favorable to the prevailing party. [Citations omitted.]"

Under the law of the case, the fastener issue was within BESCO's scope of work, but the water infiltration issue was not. *BESCO II*, 2015 WL 4879075, at *19; *BESCO I*, 2009 WL 4639486, at *6-7. Accordingly, BESCO is obligated to indemnify Walton for damages arising from the fasteners because they were within BESCO's scope of work. *BESCO I*, 2009 WL 4639486, at *6. Nevertheless, Walton still has the burden to prove what damages it incurred as a result of BESCO's defective work. See *Cerretti v. Flint Hills Rural Electric Co-op Ass'n.*, 251 Kan. 347, 362, 837 P.2d 330 (1992).

*Costs of Removing the Metal Wall Panel System*

Much as it did in *BESCO II*, BESCO first argues that it was not liable for any of the costs related to removal of the metal wall panel system. According to BESCO, the water infiltration problem required removal of the metal panels, and BESCO is not responsible for the water infiltration. See *BESCO I*, 2009 WL 4639486, at *6. BESCO suggests the district court overlooked evidence that supported its position, including an April 2004 email from Rombach showing that he knew removal of the entire wall panel system was necessary to fix the water infiltration problem before anyone had made a decision on how to fix the fastener issue. BESCO also argues that awarding 85% of the cost was arbitrary. BESCO notes the district court cited Rombach's testimony that 85% to 95% of the metal panels were removed during the remediation, but it argues this

24

testimony bears no relation to any party's percentage of fault. Consequently, BESCO asks us to vacate this portion of the damages award.

Walton responds that Rombach's testimony supports the district court's award of 85% of the metal panel removal costs. It reiterates that Rombach testified the metal panels had to be removed to gain access to the fasteners, and the majority of the remediation costs were incurred to fix the fastener issue. It adds that the district court properly relied on Rombach's testimony that 85% to 95% of the metal panels were removed in concluding that the removal of the metal panels fell within BESCO's scope of work.

Walton also asserts that BESCO incorrectly focuses on the scope of its work under its subcontract with Walton when the determining factor should be the work to *correct* BESCO's defects. Walton points to Rombach's testimony that the defective fasteners had to be fixed right after their discovery "to avoid unthinkable consequences that would result from a failure of the glass curtain wall system." Walton adds that Rombach also testified the metal panels had to be removed to access and fix the fasteners.

The district court held that the metal panels had to be removed to fix the fastener issue. Rombach's testimony supports this finding. The district court found Rombach's testimony "credible and persuasive," and we do not reevaluate such credibility determinations.

Regardless, the district court's award of 85% of the metal panel removal costs is still an unreliable approximation of BESCO's responsibility under its indemnification clause. Both parties agree the court arrived at this number in part because Rombach testified 85% to 95% of the metal panels had to be removed. But this testimony has no logical connection to what percentage of the total work of removing the panels was within BESCO's scope of work. Rombach also testified that a majority of the remediation

25

costs were attributable to fixing BESCO's defective work. Still, this would support an award anywhere from 51% to 99%, so it cannot establish an award of 85% of costs without other evidence. Subsequently, substantial competent evidence does not support the district court's ruling that BESCO is responsible for 85% of the cost of removing the metal wall panel system.

Both Walton and the district court spent a significant amount of time emphasizing that the fastener issue was a major structural safety problem that could have caused fatalities if the curtain wall had fallen onto spectators at the stadium. For instance, in its memorandum decision, the district court noted: "Here, the deadly latent defect was the anchoring of the curtain wall. If the University did not address the curtain wall issue immediately, it risked being responsible for the deaths of patrons at Memorial Stadium. In contrast, the water infiltration carried no risk of injury or death." Similarly, in its brief, Walton states: "The discovery of the improper fasteners revealed an immediate and significant life-safety concern . . . . [KU] promptly undertook work to correct the anchorage problem to eliminate the structural risk that the glass panels in the press box would come tumbling down into the stands."

The potential hazard created by the fastener issue is not relevant to determining Walton's damages, though. As BESCO argues in its reply brief: "Walton's case is for contractual indemnification, not for punitive-type damages to punish BESCO for what Walton claims might have been." Even if BESCO's defective work created a greater hazard than the water infiltration, BESCO is not necessarily responsible for a larger portion of the remediation costs. Instead, Walton must prove that its damages stem from BESCO's scope of work in order to receive indemnification from BESCO. Walton cannot do this by simply highlighting a hypothetical catastrophe.

*Costs of Removing Glass*

Next, BESCO argues the district court erroneously assessed half the glass removal costs to it. It notes this award is identical to the award *BESCO II* reversed, and it contends the evidence still fails to connect its work to the glass removal. In support, BESCO highlights the evidence that showed the glass had to be removed to fix the water infiltration, and the fastener issue could have been fixed without removing the glass.

In response, Walton emphasizes the evidence showing that the fasteners had to be fixed from outside of the press box, requiring the glass removal. In addition, it notes that BESCO subcontracted to remove and repair the glass for the remediation, but it did not suggest to anyone that doing so was unnecessary or unduly expensive. Walton argues that, based on the evidence, the district court was free to (1) attribute all the glass removal costs to the water infiltration issue and none to BESCO; (2) attribute all the glass removal costs to BESCO, "putting the emphasis on the need to correct the emergency life and safety situation that existed"; or (3) "weigh[] the credibility of the witnesses and assess[] 50% of the glass removal costs to BESCO."

The *BESCO II* court determined that substantial competent evidence did not support a ruling that BESCO should be responsible for half the glass removal costs. 2015 WL 4879075, at *19. Walton does not argue that this ruling is clearly erroneous or manifestly unjust, nor does there appear to be any reason to make this finding. Furthermore, Walton presented no new evidence on the second remand. Under *BESCO II*, substantial competent evidence does not support the district court's award of half the glass removal costs.

All the same, the record does not support the district court's assessment of half the glass removal costs to BESCO. Walton carried the burden to prove damages. See *Cerretti*, 251 Kan. at 362. Under the law of the case, at least some of the remediation

27

costs were because of the water infiltration issue, for which BESCO is not responsible. *BESCO II*, 2015 WL 4879075, at \*19; *BESCO I*, 2009 WL 4639486, at \*6-7. Despite these holdings, Walton did not put on evidence apportioning the costs between the work to fix the fastener issue and the work to fix the water infiltration issue. Instead, Walton presented Rombach, who testified that most of the remediation costs, including all the glass removal costs, should be attributed to BESCO's scope of work. In contrast, Miller testified that the work to fix the fastener issue could be done from inside the press box, and the glass removal was unnecessary. Neither witness provided any basis by which to determine what percentage of the glass removal costs were attributable to Walton's and BESCO's respective scope of work. Thus, the evidence provides no reasonable basis by which to conclude that BESCO should be liable for 50% of the glass removal costs. See *Peterson*, 302 Kan. at 106 ("'[T]here must be some reasonable basis for computation [of damages] which will enable the trier of fact to arrive at an approximate estimate thereof.'"); see also 25 C.J.S., Damages § 39 ("Where there is evidence as to damage from various causes, as to a portion of which the defendant cannot be held responsible, and no evidence as to the portion of the damage resulting from the separate causes, the proof is too uncertain to permit the jury arbitrarily to apportion part of all of the proved damages to the acts for which the defendant is responsible.").

To return to the district court's analogy, a homeowner undertakes a project to fix squeaky floors and discovers the floor joists are faulty. The homeowner removes the floor boards to fix the faulty floor joists and the squeaky floor. The carpenter who installed the floor joists, but who is not responsible for the squeaky floor, can still be liable to the homeowner for the costs of removing the floor boards. Before the homeowner can recover, though, the homeowner must provide evidence showing what portion of the costs of removing the floor boards is attributable to the carpenter's faulty joists and what portion is attributable to the squeaky floor. Without that evidence, there is no way to reasonably apportion the costs.

28

In an apparent attempt to provide evidentiary support for its award, the district court calculated that Rombach saw 50% of the entire remediation project based on his testimony at the first trial. From this, it concluded that Rombach saw the removal of at least 50% of the glass. Because Rombach also testified "he never saw a single penetration of any screw through the metal channel," the court found that "BESCO must be responsible for at least 50% of the cost of the glass panel removal." Rombach never actually testified that he saw 50% of the glass removal or that BESCO should be responsible for 50% of the glass removal costs. This holding is simply too conjectural.

Because substantial competent evidence does not support the district court's award, we reverse. We also find we need not remand this case for a third time. As our Supreme Court has explained:

> "In some instances, this court will remand the case before it for a reconsideration of the evidence at the trial court level in light of its opinion. Remand is not necessary, however, where an appellate court announces no new legal principles, but instead reviews the record in light of the existing law and determines that the record cannot support the trial court's conclusions." *LSF Franchise REO I v. Emporia Restaurants, Inc.*, 283 Kan. 13, 42, 152 P.3d 34 (2007).

We announce no new legal principles in this case. This court has twice found that substantial competent evidence does not support the damages award, and we make this same finding on the third appeal. Walton has had three chances to present evidence that would support its damages award, and it has failed to do so. We see no reason to give Walton a fourth chance. As a result, we reverse without remanding. See *Intellisports, L.L.C. v. Fitzgerald*, No. 100,196, 2009 WL 981909, at *3-4 (Kan. App. 2009) (unpublished opinion) (reversing damages award on third appeal without remanding).

29

*Attorney Fees*

We finally address whether the district court erred in awarding attorney fees.

BESCO challenges the sufficiency of the evidence supporting the district court's award of attorney fees. BESCO points out that KU and Walton both submitted fee records that date to 2003, more than a year before any demand was made on BESCO for the fastener issue. It also argues Walton has made no attempt to differentiate which fees either it or KU incurred because of BESCO's scope of work for the first and second awards. It adds that the district court impermissibly included costs of collection, which the BESCO subcontract specifically excludes, and appellate fees, which a district court cannot award. BESCO contends that Walton incurred attorney fees due to its own "flawed litigation strategy," and Walton should not be able to recover such fees as it is no longer the prevailing party.

Walton responds that the district court properly ordered BESCO to indemnify Walton and KU for its fees and costs under BESCO's subcontract. In support, Walton highlights that the district court awarded it "the majority, but not all, of its requested fees and costs." Walton points out that after the first trial, it sought more than $286,000 in attorney fees and costs, but the district court awarded it only $250,000. Walton notes the district court awarded it only $55,709 for its work after the first trial, almost $40,000 less than it had requested. Walton adds the attorney fees award is fair because BESCO has "steadfastly" refused to acknowledge any liability and responsibility for its actions "through the long and winding history of this litigation."

If the district court has authority to grant attorney fees, we review any award for an abuse of discretion. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 81, 350 P.3d 1071 (2015). The district court has wide discretion to determine the amount and the recipient of an award of attorney fees. When reviewing an award of attorney fees, the

appellate court does not reweigh the testimony or the evidence presented or reassess the credibility of witnesses. An award of attorney fees will not be set aside on appeal when supported by substantial competent evidence. *In re Marriage of Strieby*, 45 Kan. App. 2d 953, 973, 255 P.3d 34 (2011).

The *BESCO I* court held the indemnification provision of Walton and BESCO's contract obligated BESCO to indemnify Walton and KU

> "from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of [BESCO's] Work under the Subcontract, . . . but only to the extent caused in whole or in part by negligent acts or omissions of [BESCO] . . . ." 2009 WL 4639486, at *5.

Thus, in order to recover attorney fees, Walton had to demonstrate that those fees were incurred because of BESCO's scope of work. See *BESCO II*, 2015 WL 4879075, at *21.

As the *BESCO II* court has already held, the district court erred in awarding $255,171.70 in KU's attorney fees; $43,707.71 in KU's costs; and $250,000 in Walton's attorney fees up to and including the first trial. 2015 WL 4879075, at *21. Both KU's and Walton's fee itemizations supporting these awards include work conducted before the discovery of the fastener issue in 2004. Additionally, the district court did not adjust the amount of the award to include only work tied to BESCO's indemnification obligation. As BESCO points out, KU's fee itemization includes work performed on behalf of other subcontractors. Walton did nothing on remand to fix these issues and simply asked the district court to reinstate these awards.

On appeal, Walton argues that the awards were reasonable because "BESCO's defective work was installed during the initial construction, which preceded the actual litigation that BESCO filed in this case by several years," and that BESCO's defective work was ultimately the "root cause" of the need for remediation. BESCO need not

31

indemnify Walton and KU for attorney fees incurred before 2004 simply because its defective work existed during that time. Instead, substantial competent evidence must show that KU and Walton incurred those attorney fees because of BESCO's scope of work. Here, it does not.

These fee awards have other problems. An affidavit and fee itemization for Walton states that Walton incurred $176,479.88 in attorney fees between July 2002 and October 2006. At a hearing after the first trial in April 2008, Walton asked for $286,891.07 in attorney fees, which the district court later reduced to $250,000. The record does not appear to have any documents supporting the additional $73,520.12 that Walton was awarded after the first trial. According to a motion filed by BESCO, Walton submitted its billings in camera in March 2008, but those billings never made it into the record.

The record does not appear to have any documents supporting Walton's attorney fees award of $55,709 after the first remand. BESCO claims this award improperly includes the $30,414.62 in appellate fees and costs that Walton requested after the first appeal and that the *BESCO I* court denied. BESCO also argues this award includes the costs of collection, which the Walton and BESCO subcontract does not allow. With no record of what the $55,709 in fees includes, we cannot evaluate this claim.

As with the previous issue, we reverse the award of attorney fees because substantial competent evidence does not support it. Again, Walton has had several chances to provide evidence supporting the attorney fees award and has not done so. Since Walton has also failed to prove it is entitled to damages, it is no longer clear that it could show it incurred any attorney fees because of BESCO's scope of work. See *Wolfert Landscaping Co., L.L.C. v. LRM Industries, Inc.*, No. 106,989, 2012 WL 5392143, at *6 (Kan. App. 2012) (unpublished opinion) (holding district court reasonably concluded

32

defendant had not incurred attorney fees due to plaintiff's breach of contract). We thus reverse the attorney fees award without remand.

Reversed.